**Certiorari Denied, December 23, 2009, No. 32,046**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-010**

**Filing Date: September 11, 2009**

**Docket No. 28,019**

**STATE OF NEW MEXICO,**

   **Plaintiff-Appellee,**

**v.**

**ANDRES JOAQUIN TAFOYA,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Mark A. Macaron, District Judge**

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

Billy R. Blackburn
Paul Linnenburger
Albuquerque, NM

for Appellant

OPINION

**GARCIA, Judge.**

**{1}**     Defendant was convicted of four counts of first degree criminal sexual penetration of a minor under the age of thirteen (CSPM) in violation of NMSA 1978, Section 30-9-11(C)(1) (2001) (amended 2007), and two counts of third degree criminal sexual contact of a minor under the age of thirteen (CSCM) in violation of NMSA 1978, Section 30-9-13(A)(1) (2001) (amended 2003).  Defendant appeals, arguing (1) that his right to due

1

process was violated by the lengthy charging period and by the fact that the charges were not sufficiently specific to provide him with adequate notice and an opportunity to defend himself, (2) that the district court erred in admitting certain hearsay testimony, (3) that the district court improperly instructed the jury on several matters, and (4) that prosecutorial misconduct deprived him of a fair trial. We conclude that the lack of specific factual information in the indictment and the evidence introduced at trial constitute a violation of Defendant's right to due process as to two of the convictions of CSPM. Therefore, we reverse Defendant's convictions for one count of vaginal CSPM and one count of anal CSPM. We conclude that no other reversible errors occurred at trial, and we affirm Defendant's remaining convictions.

## BACKGROUND

{2}     After Defendant's seven-year-old niece, L.T., told family members that Defendant had molested her, Defendant was charged with two counts of first degree CSPM for vaginal penetration, two counts of first degree CSPM for anal penetration, one count of CSCM for touching L.T.'s genitalia, and one count of CSCM for forcing L.T. to touch his genitalia.

{3}     Defendant was alleged to have had regular access to L.T. when she had overnight visits with her father, who is Defendant's brother, and when she had weekly visits at her paternal grandparents' home. Originally, the charging period for each count of the indictment began on January 24, 2002 and ran through December 31, 2004. The charges were based on L.T.'s statements that Defendant had vaginal intercourse with her "lots of times," had anal intercourse with her "about [three] times," touched her genitalia with his hand "about [ten] times," and made her touch his penis "about [four] times." Defendant moved for a bill of particulars, and the State narrowed the time frame to the period beginning September 30, 2002 and ending December 26, 2004—a period of twenty-seven months. Despite the more limited time frame, Defendant moved to dismiss, arguing that both the length of the charging period and the lack of factual specificity in the charges violated his right to due process. Eventually, after the State conducted further interviews with L.T., the district court issued an order clarifying that the factual bases for the charges were four specific incidents that the parties referred to as the "Hooter's incident," the "Rash incident," the "Mouth-Covering incident," and the "Last Time or Christmastime incident." Two other specific incidents previously identified by L.T.—the "First Time incident" and the "Camping incident"—were not identified as charging offenses in this case, since the First Time incident was outside of the stated charging period and the Camping incident occurred outside of Bernalillo County. The district court's order indicated L.T. did not specify the type of act that occurred during each of the four charged incidents and the State's theory was that there were progressive acts of CSCM and CSPM that occurred at each incident. The district court noted that "since specific incidents have been identified, it would be appropriate for the State to elicit evidence or testimony about [D]efendant's acts, number of acts and/[or] combination of acts which are alleged to [have been] committed during these specified incidents."

{4}     At trial, L.T. described the Hooter's incident as an act of CSCM based on her

2

testimony that Defendant "touched" her "private parts" with his "whole hand." L.T. testified that the Mouth-Covering incident involved Defendant "touch[ing]" her. L.T. did not testify about a specific incident that gave her a rash, although she did testify that Defendant's acts of touching her with his hand, touching her with his penis, and rubbing his penis against her butt generally made her feel like she either had or might get a rash. As to the Christmastime incident, L.T.'s testimony indicated that Defendant did something to her that she did not like, but she did not specify what the act was. L.T. did not indicate that any of the four specific incidents began with an act of CSCM and progressed to an act of CSPM, as had been previously posited by the State. Therefore, there was no evidence at trial that any of the four specific incidents designated in the district court's order involved an act of CSPM.

{5}     The prosecution did elicit testimony at trial from L.T. that Defendant engaged in a non-specific course of conduct involving both vaginal and anal CSPM: L.T. testified that Defendant would "touch" her "private" with his "private" and that when he did this "[i]t just keeps going up and up and it hurts real bad" and that this happened "[l]ots of times." L.T. also stated that "sometimes [Defendant] would stick [his private] inside . . . my butt" and that he did this "more than one time." Several other witnesses testified about statements L.T. had made to them regarding the abuse, but this testimony did not add any information about the specific incidents of abuse.

{6}     The jury found Defendant guilty on all six charges. Defendant appeals.

## DISCUSSION

### The Length of the Charging Period in the Indictment and the Bill of Particulars

{7}     Defendant argues that the extended charging period violated his right to due process. We review this legal argument de novo. *See N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 27, 142 N.M. 248, 164 P.3d 947 ("We review questions of constitutional law and constitutional rights, such as due process protections, de novo.").

{8}     In *State v. Baldonado*, 1998-NMCA-040, ¶ 26, 124 N.M. 745, 955 P.2d 214, this Court explained that we assess the constitutionality of the length of a charging period by balancing whether the state reasonably narrowed the time frame of the indictment against any prejudice the defendant has suffered as a result of the time frame chosen by the state. We provided a list of nine nonexclusive factors to be used in applying this test. These are:

> 1.     The age and intelligence of the victim and other witnesses, and their ability to particularize the date and time of the alleged offense;
>
> 2.     The surrounding circumstances; including whether a continuing course of conduct is alleged, as opposed to a relatively few, discrete or isolated events;
>
> 3.     The extent to which [the] defendant had frequent, unsupervised access to the victim;

3

4. The nature of the offense, including whether it is likely to occur at a specific time or is likely to have been discovered immediately;

5. The length of the alleged period of time in relation to the number of individual criminal acts alleged;

6. The length of time asserted in the indictment;

7. The passage of time between the period alleged for the crime and the time the abuse was asserted and/or the time [the] defendant was arrested and/or indicted;

8. The extent and thoroughness of the [s]tate's efforts to narrow the time frame; and

9. Whether the defendant can assert a plausible alibi defense.

*Id.* ¶ 27. Although we stated that the two-year charging period in *Baldonado* "approach[ed] the outer edges of constitutional propriety," we declined to hold that it was too long as a matter of law because "[i]t is possible that a two-year period, or larger, may be the most narrow time frame the prosecutor can be required to muster in an appropriate case." *Id.* ¶ 23.

**{9}** In this case, the charging period was originally thirty-five months. After Defendant moved for a bill of particulars, the district court directed the State to attempt to narrow the charging period. After meeting with L.T. and her mother, the State narrowed the charging period to approximately twenty-seven months. The State made additional efforts to narrow the time frame even further. The State amended the bill of particulars to add details about the first time and the last time the abuse occurred but ultimately concluded that "[t]he State believes L.T. was molested on a continuous basis between the time frame of September 30, 2002 through December 20, 2004. Even though the State can narrow down the overnight visits [that L.T. had with her father], the State believes several acts of sexual abuse occurred during the day at her grandparent[s'] home."

**{10}** Defendant moved to dismiss pursuant to *Baldonado*. The district court issued a detailed order denying Defendant's motion. The district court weighed the reasonableness of the State's efforts to narrow the charging period against the potential prejudice to Defendant caused by the State's twenty-seven-month time frame. In doing so, it focused on most of the *Baldonado* factors. The district court noted that: (1) the crimes were alleged to have occurred while L.T. was between the ages of five and seven, and although L.T. was apparently of sound intelligence for her age, it was clear from the multiple interviews with L.T. that she did not have the capacity to provide more particular dates or time periods for the alleged incidents; (2) the alleged incidents occurred on a continuous basis and were not just a few isolated events; (3) although the extent to which Defendant had frequent and unsupervised access to L.T. was disputed, it was not disputed that he was often present in the same residence as L.T. during the daytime and overnight; (4) the nature of the charged offenses was such that they did not occur in the presence of other witnesses, and because

4

L.T. suffered no physical injury in this case, the alleged offenses were not of the sort that was likely to be discovered immediately; and (5) according to L.T.'s statements that Defendant had vaginal intercourse with her "lots of times," had anal intercourse with her "about three times," touched her genitalia with his hand "about ten times," and made her touch his penis "about four times," L.T. was abused a total of seventeen times. If each incident of abuse occurred at separate times, then the events occurred approximately once every 1.64 months. If the events occurred in combination, then they occurred less frequently.

**{11}** The district court noted other *Baldonado* factors as well. The length of time in the indictment was originally three years but had been narrowed to approximately twenty-eight months. The State engaged in a thorough attempt to narrow the time frame, and it appeared that L.T. was unable to identify more specific dates or otherwise further reduce the charging period. There were no other available means by which the State could obtain information about when the events occurred. Defendant's claim of prejudice was based on his proposed alibi defense, but his evidence of an alibi—such as bank records, cell phone records, employment records, and vacation records—would all require extremely narrow time frames such as specific dates in order to be effective. Given L.T.'s limited capabilities and the evidence about how often Defendant might have had access to L.T., the State's evidence did not lend itself to an alibi defense. In weighing these factors, the district court found that the State could not reasonably have provided greater specificity in the charging period and that Defendant failed to demonstrate that he was prejudiced by the lengthy indictment period more than any other defendant in a child sex abuse case "because in almost all such cases the young child does not have the capacity to specify particular dates and times of the alleged sexual abuse."

**{12}** Although the revised charging period was lengthy, we agree with the district court's conclusion that the State demonstrated it had done everything it reasonably could have done to narrow the charging period and that Defendant was not unduly prejudiced. *See State v. Ervin*, 2002-NMCA-012, ¶ 13, 131 N.M. 640, 41 P.3d 908 (filed 2001) (indicating that the burden is on the state to establish that it could not have provided greater specificity as to the time of the alleged offenses). After Defendant moved for a bill of particulars, the State re-interviewed L.T. and her mother, and interviewed L.T.'s father in an effort to obtain more specific dates. As a result of these interviews, the State was able to reduce the original charging period by eight months, to approximately twenty-seven months. The State then consulted with a forensic interviewer in order to develop more appropriate questions to ask L.T. at another interview. However, at the subsequent interview, L.T. was still unable to provide details that would have permitted the State to narrow the charging period. As L.T. was the only witness to the crimes, we cannot see how the State could have found additional information that would have narrowed the time period further. Defendant suggests that the State should have examined school records and medical records, and followed up with other witnesses such as L.T.'s grandparents and other relatives. Defendant does not explain, however, how such avenues of investigation would have produced a narrower time frame. L.T. was the only person present when Defendant committed the offenses, and there was no evidence that her grades went down at the time of the offenses or that she obtained medical treatment as a consequence of the offenses. Therefore, we do not agree that the State was required to pursue these sources of information.

**{13}**     Defendant also claims that the State should have limited the charging period to the specific visitation days scheduled at L.T.'s father's home and at her paternal grandparents' home. Although we note that the State did provide guidance in an attachment to its bill of particulars as to when some of the visits occurred between September 30, 2004 and December 26, 2004, this information was obtained from L.T.'s mother, and she did not have records of other visitation dates. In light of the fact that the abuse was alleged to have occurred on an ongoing basis for more than two years prior to these specific dates, the State would not be required to limit the charging period to these specific dates. In addition, witnesses testified that both the overnight weekend visits with L.T.'s father and the weekday visits with her grandparents did not occur on a fixed schedule but changed regularly. Therefore, it appears that the State could not have reconstructed the visitation schedule to arrive at more particular dates within the charging period.

**{14}**     Defendant asserts that the prejudice he suffered as a result of the lengthy charging period was "real and substantial." Applying three of the *Baldonado* factors, he argues that the charging period is facially unreasonable, that the charges were for a few discrete incidents within that lengthy period, and that if the period had been shorter he could have used his employment records, school records, bank records, and phone records to provide an alibi defense. *See Baldonado*, 1998-NMCA-040, ¶ 27. We conclude that the charging period was not unreasonable under *Baldonado*.

**{15}**     First, Defendant's argument that the charges arise from a few discrete incidents is not accurate or persuasive. The district court's order specifically stated that the two CSCM charges were not for specific incidents but were for a continuing pattern of conduct. As we discuss later in this opinion, the evidence submitted regarding the CSPM charges also described an ongoing pattern of conduct, not a few discrete incidents. Therefore, this *Baldonado* factor does not weigh in Defendant's favor.

**{16}**     Second, Defendant's desire to present an alibi defense is one of the factors to consider. *Id.* ¶ 29. The State is not required to "rely only on evidence that lends itself to an alibi defense." *Id.* (internal quotation marks and citation omitted). Furthermore, Defendant is unable to adequately demonstrate on appeal that he was deprived of the ability to present an alibi defense. Defendant asserts that he possessed relevant records covering the entire charging period. However, at trial, he introduced only a sample of such records that he characterized as "representative." These representative records have not been designated as part of the record for review on appeal. *See* Rule 12-212 NMRA (governing the designation of exhibits on appeal). Because neither the actual nor the representative records are before us, Defendant is unable to show this Court that he would have been able to establish a plausible alibi defense for any of the time periods he was around L.T. Without these records, we cannot review the district court's determination that Defendant was not prejudiced by the failure to shorten the charging period to fit his alibi defense. *See Baldonado*, 1998-NMCA-040, ¶ 32 (noting that the defendant, who had regular access to the victim, was likely not prejudiced by the two-year charging period in part because even "if the district court determines that, say, a one-month or three-month period would have been adequate, then it is unclear that [the defendant] could have had any evidence available to establish his absence from [the place where the victim was] during that entire period of time"); *State v. Wilcox*, 808 P.2d 1028, 1033-34 (Utah 1991) (noting that a defendant who

6

had regular contact with the victim was not prejudiced by the length of the charging period because "[t]his is not a situation in which the lack of specificity compromise[d] the defense, as it would if [the defendant] had contact with the child only once or twice, so that specific dates and times were critical").

**{17}** While one of the *Baldonado* factors for measuring prejudice is the length of the charging period, 1998-NMCA-040, ¶ 27, a fair reading of *Baldonado* indicates that a long charging period does not itself constitute prejudice. *Id.* ¶ 23 (declining to adopt a rule that a certain period of time is a per se violation of due process, since it is possible that a lengthy period is "the most narrow time frame the prosecutor can be required to muster"); *see Ervin*, 2002-NMCA-012, ¶¶ 10, 21 (rejecting an argument that there should be a presumption that extended charging periods violate due process and accepting a time frame limited to when the defendant had ongoing access to the child). The analysis of prejudice is both predicated upon, and distinct from, a conclusion that the charging period is overly broad. *See Baldonado*, 1998-NMCA-040, ¶ 32.

**{18}** In this case, the State's efforts at narrowing the charging period were prompted by the seriousness with which the district court took its responsibility to diligently protect the due process rights of Defendant. *See Ervin*, 2002-NMCA-012, ¶ 7. The district court was required to make additional efforts to ensure that it was "satisfied that [relevant] sources of information ha[d] been exhausted," prior to making its determination of whether the State had made reasonable efforts to narrow the time frame. *Baldonado*, 1998-NMCA-040, ¶ 28 (internal quotation marks and citation omitted). We agree that the district court struck a proper balance in weighing the reasonableness of the State's extensive efforts against the potential prejudice to Defendant arising from the lengthy charging period. Given the specific facts in this case, the revised twenty-seven-month charging period did not violate Defendant's right to due process.

**The Lack of Factual Specificity in the Charges and in the Evidence at Trial**

**{19}** Defendant argues that his due process rights were also violated because of the "State's failure to allege sufficient facts to provide [Defendant] with notice as to [the] specific acts [with which] he was charged." After the State filed its bill of particulars and after the district court required the State to make additional efforts to link the charges to specific events, the district court determined that the four counts of CSPM were intended to charge distinct events that each occurred "more than once" during the charging period, whereas the two counts of CSCM were intended to "charge continuing acts of . . . Defendant throughout the charging period." The district court concluded that the charging techniques were permissible pursuant to *State v. Altgilbers*, 109 N.M. 453, 466, 786 P.2d 680, 693 (Ct. App. 1989), which provides the State with the discretion to charge a single count for an ongoing pattern of conduct, to charge separate counts for each incident that occurred within that pattern of conduct, or to select a few of the incidents to charge. The district court ordered that during trial all the CSPM acts should be linked in some way to the four specific incidents identified in the May 12, 2006 order entered prior to trial. At trial, however, L.T. only testified about acts of CSCM, which involved Defendant's touching her, during the four specific incidents. All her testimony about vaginal CSPM, anal CSPM, and CSCM during which Defendant made L.T. touch his penis was described through non-specific testimony

7

elicited as an ongoing pattern of conduct. L.T. described typical patterns of each of these types of abuse and then stated that the abuse occurred more than once or lots of times.

**{20}** Defendant relies primarily on *State v. Dominguez*, 2008-NMCA-029, 143 N.M. 549, 178 P.3d 834 (filed 2007), *cert. denied*, 2008-NMCERT-002, 143 N.M. 665, 180 P.3d 672, and *State v. Foster*, 87 N.M. 155, 530 P.2d 949 (Ct. App. 1974), in support of his argument that the lack of factual specificity in the charging documents and the evidence requires a reversal of his convictions for all six charges. Like *Baldonado*, *Dominguez* addressed a due process violation for the state's failure to provide adequate notice of the charges and to provide the defendant with an adequate basis on which to defend himself. 2008-NMCA-029, ¶ 1. However, *Dominguez* differs from *Baldonado*, since it was not the length of the ten-week charging period that was at issue but rather the failure of the state to provide any identifying characteristics that would differentiate one charged count from another and protect the defendant from the possibility of double jeopardy. *Dominquez*, 2008-NMCA-029, ¶¶ 6, 10. We review Defendant's additional due process claim under *Dominguez* de novo. *See id.* ¶ 5.

**{21}** In *Dominguez*, this Court affirmed the dismissal of those indistinguishable counts of an indictment that were based on the victim's statements that the same type of abusive behaviors were repeated over a period of time. *Id.* ¶¶ 7, 10-11. The state was able to proceed with prosecution of those acts for which it was able to provide a factually distinct basis. *Id.* ¶¶ 10-11. As to the five dismissed charges, this Court held that it would have violated the defendant's due process rights to have to defend against the five carbon-copy counts when the state was unable to provide facts that would distinguish any one of the incidents from another. *Id.* Relying on the Sixth Circuit Court of Appeals reasoning in *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005), we stated that the indictment was defective because it "provided the defendant with little ability to defend himself since the counts were not anchored to particular offenses." *Dominguez*, 2008-NMCA-029, ¶ 8 (internal quotation marks and citation omitted). "[I]t would have been impossible for the jury to conclude that the defendant was guilty of some of the offenses, but not others . . . because the criminal counts were not connected to distinguishable incidents." *Id.* (internal quotation marks and citation omitted). Therefore, *Dominguez* stands for the proposition that even if a charging period is constitutionally appropriate under *Baldonado*, the charges may still violate a defendant's right to due process and double jeopardy when they are factually indistinguishable.

**{22}** In the present case, Defendant's *Dominguez* argument is somewhat misapplied. In *Dominguez*, all of the charges were exactly the same in that each charged an act of CSCM by the same means, on the same victim, and within the same date range. *See id.* ¶ 2. Here, all of the charges in the indictment were for acts that occurred with the same victim and within the same date range. However, the remaining characteristics were different. It is clear that the one count of CSCM for Defendant's act of touching L.T.'s genitalia is different from the second count of CSCM that is based on Defendant forcing L.T. to touch his genitalia. Furthermore, the charges of vaginal CSPM and anal CSPM are distinguishable from one another because they are factually distinct acts. Therefore, Defendant's *Dominguez* argument would apply only to the two indistinguishable counts of vaginal CSPM in the indictment and the two indistinguishable counts of anal CSPM in the indictment.

8

**{23}** The State argues that the two counts of vaginal CSPM are in fact distinguishable because Count 1 for vaginal CSPM was intended to be a single count for a pattern of conduct of penetrating L.T.'s vulva and Count 2 for vaginal CSPM was intended to be a single count for a pattern of penetrating L.T.'s vaginal canal. This argument is not supported by the indictments, the evidence at trial, or by the record. In particular, such a distinction cannot be made where the jury instructions were the same for both Count 1 and Count 2. These instructions permitted the jury to find Defendant guilty if he "caused the insertion to any extent, of a penis into the vagina and/or vulva" of L.T.

**{24}** We agree with Defendant that, as in *Dominguez*, the two undifferentiated counts of vaginal CSPM and the two undifferentiated counts of anal CSPM ultimately violated Defendant's right to due process. Although the State factually alleged that these CSPM charges arose out of one of the four distinguishable incidents, the evidence at trial did not support this allegation. At trial, L.T. only described a pattern of vaginal CSPM and a pattern of anal CSPM and then said that each happened lots of times, without relating any act to a specific incident. As a result, due process will only permit Defendant to be convicted of a single count of vaginal CSPM and a single count of anal CSPM for each pattern of conduct. *See Valentine*, 395 F.3d at 637 (holding that due process permitted the affirmance of single convictions for a pattern of conduct of each type of sexual abuse charged, but that the convictions for the remaining indistinguishable counts as to each type must be vacated); *see also State v. Gardner*, 2003-NMCA-107, ¶ 28, 134 N.M. 294, 76 P.3d 47 (holding that allegations of the two victims supported a single count of CSCM against each victim for a pattern of conduct when they described "a continuing course of conduct under circumstances where [the defendant] . . . had frequent but unpredictable access to [the victims] such that the alleged contact occurred continuously and randomly"). We therefore reverse one of Defendant's convictions for vaginal CSPM and one of Defendant's convictions for anal CSPM. There was no due process violation in the single remaining count of vaginal CSPM and the single remaining count of anal CSPM based upon the evidence presented at trial establishing a pattern of CSPM conduct during the charging period for which Defendant had notice and an opportunity to defend. *See Valentine*, 395 F.3d at 637.

**{25}** This case is also different from *Dominguez* because in *Dominguez*, the district court dismissed several of the charges prior to trial due to the state's inability to differentiate the indistinguishable charges in its bill of particulars. Here, the State argues that any insufficiency in the indictment was cured by the district court's later order that the counts were supported by the four particular incidents and the fact that the district court indicated that each incident included at least one act of CSCM and one act of CSPM. However, at trial, the testimony established that only acts of CSCM occurred at the Hooter's incident and the Mouth-Covering incident. The State did not elicit testimony specifying what happened during the Christmastime incident or describing a particular occurrence that could be identified as the Rash incident. Therefore, any adequate notice of the four CSPM charges that may have been satisfied by the State's bill of particulars and the district court's order was undermined by the evidence at trial. The State's evidence was only sufficient to prove one undifferentiated count of vaginal CSPM and one undifferentiated count of anal CSPM. Ultimately, it is the evidence admitted at trial that must be reevaluated by the district court to determine whether a criminal charge is sufficient to satisfy the due process requirements under *Dominguez*.

**{26}**     Finally, Defendant asserts that *Foster* requires reversal of all six of his convictions. In *Foster*, the defendant was indicted for one count of sodomy that was alleged to have occurred "[o]n or about August, 1973." 87 N.M. at 157, 530 P.2d at 951 (internal quotation marks omitted).  At trial, the victim testified that one act of sodomy by fellatio happened toward the end of August, that a second such act occurred about a week after that, and that a third act occurred about a month later. *Id.*  The victim's guardian also testified about the third act. *Id.*  The defendant was convicted of the single count of sodomy, and on appeal, this Court held that the defendant was denied his right to fair notice of the crime charged so as to be able to prepare his defense. *Id.* at 157-58, 530 P.2d at 951-52.  The evidence established three distinct acts of sodomy, and it was unclear from the charges whether the defendant was being tried and ultimately convicted by the jury of the first, second, or third act.  We held that the "[f]ailure to charge the defendant with a specific act or specific acts violate[d] his right to be informed of the charges against him and denie[d] him due process of law" under the Sixth and Fourteenth Amendments of the Federal Constitution. *Id.* at 157, 530 P.2d at 951.

**{27}**     As with Defendant's *Dominguez* argument, Defendant's contention under *Foster* is somewhat unclear.  Defendant asserts generally that he is entitled to sufficient notice of the crimes charged in order to prepare a defense.  Like the defendant in *Foster*, Defendant asserts that he "now sits in prison, entirely unable to determine for which acts he has been convicted," and that he would not be able to "plead prior jeopardy in a subsequent trial." *See id.* at 157-58, 530 P.2d at 951-52.  However, Defendant does not provide any analysis of how he believes the ruling in *Foster* specifically applies to his convictions.  As we explain below, we conclude that *Foster* does not require reversal of any of Defendant's convictions.

**{28}**     Defendant was on notice that the two acts of CSCM were charged as continuing patterns of conduct based on multiple events within the specific charging period, and that the four acts of CSPM were based on multiple events within the same charging period. *See State v. Salazar*, 1997-NMCA-043, ¶ 11, 123 N.M. 347, 940 P.2d 195 (distinguishing *Foster* because the defendant had notice of a specific date on which the crime was alleged to have occurred and was aware of the evidence that he had two different guns on school property, even though he was charged with only one offense of unlawfully carrying a gun on school grounds).  Therefore, *Foster* is distinguishable regarding its application to the charging period in this case.

**{29}**     Furthermore, since *Foster*, we have repeatedly affirmed the principle that multiple incidents may be charged as a single count. *See, e.g.*, *Altgilbers*, 109 N.M. at 465, 786 P.2d at 692 (explaining that the state may charge one count for multiple acts); *State v. Gurule*, 90 N.M. 87, 91-92, 559 P.2d 1214, 1218-19 (Ct. App. 1977) (holding that when the defendant was aware of seventeen specific incidents in which he was alleged to have unlawfully caused payments to be made from public funds, there was no due process violation under *Foster*, since the defendant was aware that any one of these acts could have formed the basis of the single count in the indictment).  We have also held that a general pattern of criminal conduct may be charged as a single count when the state does not have specific evidence that would clearly distinguish the multiple acts. *Gardner*, 2003-NMCA-107, ¶¶ 28, 33, 38 (recognizing that evidence of a general pattern of conduct as to two separate victims supported two counts of CSCM).

10

**{30}** This Court has held that when the state chooses to use a broad charging period, it will not be able to use any incidents of the same type of acts as those charged within that charging period as the basis for a subsequent prosecution. *State v. Martinez*, 2007-NMCA-160, ¶ 14, 143 N.M. 96, 173 P.3d 18 (holding that when the state charged the defendant with five counts of CSPM within a four-month period, the defendant's plea acted as a bar to prosecution for other similar acts occurring during that time period), *cert. denied*, 2007-NMCERT-011, 143 N.M. 156, 173 P.3d 763; *Altgilbers*, 109 N.M. at 468, 786 P.2d at 695 ("Because of the scope of the indictment in this case, the state would not be permitted in the future to charge [the] defendant with any sexual offenses involving his two children during the time encompassed by the counts in the indictment."). Therefore, a defendant is put on notice that a number of different acts within the charging period may form the basis of the alleged counts against him. A defendant's distinguishable charges may be based on various distinct incidents or may be based on a general allegation of wrongful conduct that continually occurred. In this case, Defendant was put on notice of the distinct incidents alleged and that the charges were based on a continuing course of conduct. Where notice of the distinguishable charges complied with these requirements for the defined charging period, *Foster* does not require reversal of Defendant's convictions.

**The Nurse's Hearsay Testimony About the Child's Statements**

**{31}** At trial, Rosella Vialpando, a nurse who examined L.T., testified about statements L.T. had made to her. Nurse Vialpando testified that L.T. told her that Defendant touched her more than one time with his private, that he touched her butt with his private, and that he made her touch his private with her hands. The district court determined that the statements were admissible under Rule 11-803(D) NMRA as an exception to the hearsay rule. Relying on *State v. Ortega*, 2008-NMCA-001, 143 N.M. 261, 175 P.3d 929 (filed 2007), *cert. denied*, 2007-NMCERT-012, 143 N.M. 213, 175 P.3d 307, Defendant argues that the district court erred in admitting L.T.'s statements to Nurse Vialpando under Rule 11-803(D), which provides an exception to the rule against hearsay when statements are made for the purpose of medical diagnosis or treatment. The State argues that we need not consider Defendant's argument and asserts that the statements were not hearsay and were properly admitted, not for the purpose of proving that L.T. was in fact abused in the manner she described to Nurse Vialpando, but in order to explain why Nurse Vialpando performed the sort of examination that she did. *See State v. Paiz*, 2006-NMCA-144, ¶ 40, 140 N.M. 815, 149 P.3d 579 (holding that statements made to a physician were not hearsay because they were not offered to prove the content of the statements, but to explain the context of the examination). We review the admission of this evidence for an abuse of discretion. *See State v. Sanchez*, 2008-NMSC-066, ¶ 12, 145 N.M. 311, 198 P.3d 337.

**{32}** We must first determine whether the right for any reason doctrine applies to Nurse Vialpando's statements. The district court did not accept the State's argument that Nurse Vialpando's statements were not hearsay. This Court may affirm on a basis not relied upon by the district court if doing so would be fair to the appellant. *State v. Gallegos*, 2007-NMSC-007, ¶ 26, 141 N.M. 185, 152 P.3d 828 (stating that an appellate court will affirm a district court's decision if it is right for any reason, so long as it is not unfair to the appellant). In this case, it is unfair to Defendant if this Court relies on the State's new argument supporting affirmance. When evidence is introduced for a limited purpose, a party

11

may request an instruction that the jury only consider the evidence for that purpose. *See* Rule 11-105 NMRA ("When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."). Defendant did not have the opportunity to request a limiting instruction. The district court's ruling was based on an assumption that the testimony was in fact hearsay and offered for the truth of the matter asserted. It would be unfair to now apply the right for any reason doctrine when Defendant was deprived of his opportunity to request a limiting instruction at trial. The record supports this determination. In its closing argument, the State relied upon the truth of L.T.'s statements that were made to Nurse Vialpando during the examination to establish substantive evidence of penetration. Accordingly, we decline to affirm on this basis, and we will assume that the statements were in fact hearsay in order to consider whether the district court erred in admitting the testimony pursuant to Rule 11-803(D).

**{33}** Rule 11-803(D) provides that "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the rule against hearsay, even if the declarant is available as a witness. In *Ortega*, this Court held that statements made to a Sexual Assault Nurse Examiner (SANE nurse) do not fall within the exception provided under Rule 11-803(D) because the role of a SANE nurse is primarily to collect evidence for law enforcement purposes and not primarily to diagnose or treat medical conditions. *Ortega*, 2008-NMCA-001, ¶¶ 16-27. In *State v. Mendez*, 2009-NMCA-060, ¶¶ 1-3, 146 N.M. 409, 211 P.3d 206, *cert. granted*, 2009-NMCERT-006, __ N.M. __, 215 P.3d 43, we applied *Ortega* in a situation where the victim was available to testify and the defendant's confrontation rights were not at issue.

**{34}** In *Mendez*, as in *Ortega*, this Court relied heavily on facts indicating that the purpose of a SANE examination was to collect evidence for use in prosecuting the alleged perpetrator. We noted that the SANE examination occurred after the child had already been taken to a pediatric nurse for an examination, that a police officer was present for the interview portion of the SANE examination, that the victim's mother was presented with a form authorizing the release of the results of the examination to the state police, and that the victim's mother signed a form in which she acknowledged that a SANE examination is not a routine medical examination and that the SANE nurse could not be held responsible for identifying, diagnosing, or treating new or existing medical problems. *Mendez*, 2009-NMCA-060, ¶¶ 23-27.

**{35}** The present case is distinguishable from the factual circumstances in *Mendez*. The evidence does not suggest that the examination was a SANE examination performed primarily for law enforcement purposes. Nurse Vialpando testified that she is a family nurse practitioner and that as such she does "pretty much what a primary care doctor does." She stated that she is trained to assess, diagnose, and treat acute and chronic illnesses. Nurse Vialpando stated that she works at a pediatric specialty clinic at the University of New Mexico called Para Los Niños and that the clinic sees children and adolescents who have been brought in because of a concern about sexual abuse. She stated that in this case, L.T.'s mother brought L.T. in for the examination. Nurse Vialpando talked to L.T. about why she

was there, listened to L.T.'s description of what happened, and then performed an examination of L.T.'s genital and anal areas.

{36}     In this case, unlike the circumstances in *Mendez*, there was no evidence that L.T. had already had a pediatric examination prior to her examination at Para Los Niños.  Unlike *Mendez*, there was no testimony that law enforcement instigated, was present for, or was otherwise involved with L.T.'s examination.  Although Nurse Vialpando stated that she was obligated to report suspicion of sexual or physical abuse to the state Children, Youth and Families Department (CYFD), she indicated that this is a mandatory obligation imposed by law upon all teachers, doctors, nurses, and others who work with children. *See* NMSA 1978, § 32A-4-3(A) (2005) (placing a duty on "[e]very person . . . who knows or has a reasonable suspicion that a child is an abused or neglected child [to] report the matter immediately" to the police, CYFD, or other authorities).  Nurse Vialpando testified that when she teaches at a nurse practitioner program, she informs students "how to access law enforcement."  A comment indicating that a health care provider might fulfill her statutory duty to report evidence of a crime against a child to the police does not alone transform that health care practitioner's medical examination into a forensic investigation.  Defendant points out that Nurse Vialpando testified that when a person has reported being sexually abused within the prior seventy-two hours, Nurse Vialpando will perform a rape kit to swab for physical evidence and that this kit is then sent to law enforcement.  While we agree with Defendant that providing this evidence to the police is not part of either the diagnosis or treatment of any medical disorder, there was no evidence in this case that Nurse Vialpando performed a rape kit or that she provided other evidence to the police.  We are unwilling to conclude that because Nurse Vialpando sometimes provides evidence to the police after an examination, L.T.'s pediatric examination was for forensic law enforcement purposes rather than medical purposes.  As the evidence presented does not indicate that this examination falls within the law enforcement parameters announced in *Mendez* and *Ortega*, we hold that the district court did not err in admitting Nurse Vialpando's testimony under Rule 11-803(D).

**The Judge's Statement in Response to a Juror's Question About Facts Not in Evidence**

{37}     Prior to trial, Defendant filed a motion seeking a psychological evaluation of L.T.  The district court denied Defendant's motion.  At trial, Defendant presented expert testimony about false reporting of child sexual abuse and about the need to psychologically evaluate a child who makes a claim of abuse in order to minimize the possibility of such false reporting.  A juror submitted a written question to the court, asking whether L.T. had ever been psychologically evaluated.  The district court informed the jury that "since June 6, 2006, any issues related to testing and/or evaluations if any have been subject to the jurisdiction of the [c]ourt."  The court instructed the jury "not to speculate regarding the existence or nonexistence of testing and/or evaluations."  Defendant contends that his convictions should be reversed because the district court's statement that the issues related to evaluation and testing were subject to the court's jurisdiction constituted an improper instruction to the jury.

{38}     Although Defendant relies on authority stating that reversal is required when a district court incorrectly instructs the jury on the elements of an offense, *see State v. Ellis*,

13

2008-NMSC-032, ¶¶ 11-13, 144 N.M. 253, 186 P.3d 245; *State v. Sutphin*, 2007-NMSC-045, ¶ 19, 142 N.M. 191, 164 P.3d 72, Defendant is not challenging an instruction on the elements of an offense. Therefore, we conclude that these authorities are inapplicable. In fact, Defendant does not challenge the district court's statement of the law at all. Instead, he argues that the instruction was factually incorrect because it was not true that all issues relating to testing and evaluations of L.T. were subject to the district court's prior order. Defendant points out that the order only prevented Defendant from having L.T. evaluated and that the State would have been free to evaluate L.T. if it had wished. We do not agree with Defendant. The district court's statement did not communicate anything to the jury about whether either party was permitted to or forbidden from interviewing L.T. However, to the extent that the district court's statement could be considered a statement of fact about which parties were controlled by its pretrial order, Defendant has cited no authority that the district court's incorrect factual statement warrants an automatic reversal. We therefore assume that no such authority exists. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). Furthermore, Defendant has not explained how he was prejudiced by the statement, and in the absence of prejudice, we decline to reverse. *See State v. Romero*, 2009-NMCA-012, ¶ 9, 145 N.M. 594, 203 P.3d 125 (filed 2008) ("For error to be reversible, it must be prejudicial." (internal quotation marks and citation omitted))

**{39}** Defendant's second argument asserts that the district court's response to the jury question and accompanying instruction implied that the court had determined that L.T. did not need to be psychologically evaluated. We disagree. In context, the district court simply instructed the jurors that they should not speculate about whether any evaluation had or had not been performed. This instruction informed jurors that they should not speculate since there was no evidence presented one way or the other. As this is a correct statement of the law, *see* UJI 14-101 NMRA (stating that jurors "must decide the case solely upon the evidence received in court"), we hold that the district court did not err in so instructing the jury. *See State v. Lucero*, 110 N.M. 50, 52, 791 P.2d 804, 806 (Ct. App. 1990) ("Instructions are sufficient if, when considered as a whole, they fairly present the issues and the applicable law.").

**The Jury Instructions on Criminal Sexual Penetration**

**{40}** After the close of evidence, Defendant submitted a proposed jury instruction on the elements of CSPM. For the two counts of anal CSPM, Defendant's proposed instruction stated that the State must prove beyond a reasonable doubt that Defendant caused L.T. to engage in "anal intercourse," in addition to the other elements of CSPM. For the two counts of vaginal CSPM, Defendant's proposed instruction stated that the State must prove beyond a reasonable doubt that Defendant caused L.T. to engage in "sexual intercourse," in addition to the other elements of CSPM. The district court rejected Defendant's proposed instructions and instead instructed the jury that as to anal CSPM, the State must prove beyond a reasonable doubt that Defendant "caused the insertion to any extent, of a penis into the anus" of L.T. As to vaginal CSPM, the district court instructed the jury that the State must prove beyond a reasonable doubt that Defendant "caused the insertion to any extent, of a penis into the vagina and/or vulva" of L.T. Defendant argues that these instructions were reversible error because they did not follow New Mexico's Uniform Jury Instructions (UJIs) and because the instructions on vaginal CSPM permitted the jury to convict him for

14

acts that only constituted vaginal CSCM.  We review the validity of jury instructions de novo.  *State v. McClennen*, 2008-NMCA-130, ¶ 5, 144 N.M. 878, 192 P.3d 1255.

**{41}**  The general use note to the criminal UJIs provides that "when a uniform instruction is provided for the elements of a crime, . . . the uniform instruction must be used without substantive modification or substitution."  UJI-Criminal General Use Note NMRA.  It also provides that when there are alternative instructions, "only the alternative supported by the evidence in the case may be used."  *Id.*  Defendant contends that the instructions given by the district court were erroneous because the district court did not use the correct version of the instruction where two alternatives were provided in UJI 14-957 NMRA.  Therefore, we must determine whether it was error under the general use note to the criminal UJIs to give the "caused the insertion, to any extent, of [an object]" alternative when the "sexual intercourse" and "anal intercourse" alternatives were more narrowly tailored to the charges in this case.  The UJIs at issue are intended to reflect the law criminalizing sexual penetration of a minor as provided in Section 30-9-11.  Therefore, we look to that statute to inform our determination of which of UJI 14-957's two alternatives should have been given.  *See State v. Marshall*, 2004-NMCA-104, ¶¶ 7-10, 136 N.M. 240, 96 P.3d 801 (reviewing the statutory scheme to determine whether the defendant was entitled to his tendered jury instruction).

**{42}**  The first alternative instruction for the conduct that constitutes CSPM in UJI 14-957 is that the defendant "caused _____ (*name of victim*) to engage in _____."  *Id.* (footnotes omitted).  The notes to the instruction indicate that the second blank is to be filled in with one of the following acts:  "'sexual intercourse', 'anal intercourse', 'cunnilingus' or 'fellatio.'"  *Id.*  The notes in UJI 14-957 indicate that the applicable definition of the relevant act from UJI 14-982 NMRA must be given after the instruction.  In UJI 14-982, the definition of "[s]exual intercourse" is "the penetration of the vagina, the female sex organ, by the penis, the male sex organ, to any extent."  The definition of "[a]nal intercourse" is "the penetration of the anus by the penis to any extent."  *Id.*

**{43}**  The second alternative instruction for the conduct that constitutes CSPM in UJI 14-957 is that the defendant "caused the insertion, to any extent, of a _____ into the _____ of _____ (*name of victim*)."  (Footnotes omitted.)  The notes indicate that the first blank should be filled in with "the object used."  *Id.*  The second blank should be filled in with either "vagina," "penis," or "anus," and the applicable definition from UJI 14-981 NMRA must be given after the instruction.  UJI 14-957.  In UJI 14-981, the definition of "vagina" is "the canal or passage for sexual intercourse in the female, extending from the vulva to the neck of the uterus."  The definition of "anus" is "the opening to the rectum."  *Id.*

**{44}**  We agree with Defendant that the district court erred in submitting the second alternative "insertion, to any extent" instructions to the jury for the four counts of CSPM in this case.  The use notes to UJI 14-957's second alternative indicate that the "object" used to accomplish the penetration should be listed in the instruction.  In this case, the "object" that was used was Defendant's penis.  We agree with Defendant that an "object" would be something other than a penis as that term is used in Section 30-9-11(A). Section 30-9-11(A) indicates that CSPM may be committed by "the unlawful and intentional causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of

15

penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission." Sexual intercourse is generally understood to mean the insertion of a penis into the genital openings of a female. *See* UJI 14-982. Anal intercourse is generally understood to mean the insertion of a penis into the anal opening of another. *See id.* As such, intercourse involving a penis is already identified under the statutorily defined categories listed in Section 30-9-11(A) before the additional category of "any object" is identified. Where Section 30-9-11(A) lists an additional, alternative means of committing CSPM by including "the causing of penetration, to any extent and with any object, of the genital or anal openings of another," the Legislature did not mean to include conduct involving the insertion of a penis which is already described as the same two acts under the definitions set forth in UJI 14-982. Such an interpretation would render superfluous the two key defined terms of "sexual intercourse" and "anal intercourse." *See State v. Rivera*, 2004-NMSC-001, ¶ 18, 134 N.M. 768, 82 P.3d 939 (filed 2003) ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)). Therefore, the second alternative in UJI 14-957 should not have been used because it was not supported by evidence that L.T.'s genital or anal openings were penetrated by an "object" other than a penis as that term is properly used in Section 30-9-11(A). *See* UJI-Criminal General Use Note. The district court should have instructed the jury on "sexual intercourse" and "anal intercourse" under the first alternative in UJI 14-957 and then provided the appropriate definitions under UJI 14-982.

**{45}** We do not agree with Defendant that the district court's error in selecting from UJI 14-957's two alternatives requires automatic reversal. This Court reviews jury instructions as a whole to determine whether they provide a correct statement of the law. *See State v. Laney*, 2003-NMCA-144, ¶ 38, 134 N.M. 648, 81 P.3d 591 ("A jury instruction is proper, and nothing more is required, if it fairly and accurately presents the law.").

**{46}** The instruction that was given on anal intercourse stated that the jury should find Defendant guilty if the State proved beyond a reasonable doubt that Defendant "caused the insertion to any extent, of a penis into the anus of" L.T. As this instruction conveys the same definition and meaning in the instruction that should have been given—that Defendant caused L.T. to engage in anal intercourse and that anal intercourse is defined as penetration of the anus by the penis to any extent—we conclude that this instruction accurately presented the applicable law. *See* UJI 14-957; UJI 14-982. Therefore, we hold that any error in the alternate instruction given on anal intercourse was not reversible error.

**{47}** We also conclude that the erroneous instructions on vaginal CSPM did not constitute reversible error. Those instructions stated that the jury should find Defendant guilty of CSPM if it determined that Defendant "caused the insertion to any extent, of a penis into the vagina and/or vulva" of L.T. Defendant argues that permitting the jury to convict him for CSPM for penetration of the vulva was reversible error because the vulva includes the external parts of the female genitalia and merely penetrating into these external parts, rather than into the vaginal canal itself, constitutes CSCM rather than CSPM. Defendant's argument relies on the assertion that the term "sexual intercourse" in Section 30-9-11(A) does not include penetration of the vulva, and he contends that even if a penis were an "object" under the terms of the statute, statutory penetration of the "genital . . . opening[] of another" includes only the vaginal canal and not the vulva. The State, on the other hand,

16

claims that the UJIs confirm that "the vagina includes the vulva," and, therefore, penetration of the vulva constitutes "sexual intercourse" under Section 30-9-11(A).

**{48}** Although our appellate courts have indirectly recognized that penetration of the vulva is a basis for a CSPM conviction, the State has not pointed us to any New Mexico authority expressly deciding that penetration of a vulva with a penis constitutes "sexual intercourse" for the purposes of CSPM as set forth under Section 30-9-11(A). *Cf. State v. Brown*, 100 N.M. 726, 729, 676 P.2d 253, 256 (1984) (stating that "[a]ny amount of penetration" with a penis "is sufficient to complete the crime [of CSP]" but failing to explain what part of the female genitalia must be penetrated); *State v. Ervin*, 2008-NMCA-016, ¶¶ 33-36, 143 N.M. 493, 177 P.3d 1067 (filed 2007) (indicating that penetration of the vulva with a tongue is sufficient evidence of CSPM under the definition of cunnilingus), *cert. denied*, 2008-NMCERT-001, __ N.M. __, __ P.3d __; *State v. Massengill*, 2003-NMCA-024, ¶¶ 36, 41-42, 133 N.M. 263, 62 P.3d 354 (filed 2002) (reviewing, for sufficiency of the evidence, a conviction for CSPM based on an instruction to the jury that the defendant "caused the insertion, to any extent, of a finger into the vulva and/or vagina of [the child]") (internal quotation marks and citation omitted); *State v. Gomez*, 2001-NMCA-080, ¶¶ 23-26, 131 N.M. 118, 33 P.3d 669 (reviewing jury instructions for CSCM and CSPM based on both touching the exterior of and penetration of the vulva, apparently with a finger). The New Mexico Supreme Court recognized that our CSP statutes were intended to codify the common law crime of rape when it established the prohibition against the action of any person causing another to intentionally engage in unlawful "sexual intercourse." *See State v. Keyonnie*, 91 N.M. 146, 147-48, 571 P.2d 413, 414-15 (1977) (stating that the statutory offense of CSP was derived from the essential elements of the common law crime of rape). The common law definition of rape recognizes that penetration of the vulva to any extent constitutes rape. *See, e.g.*, *Commw. v. Nylander*, 532 N.E.2d 1223, 1225 (Mass. App. Ct. 1989) (stating that the common law definition of rape required only a "minimum degree of penetration," which included penetration of the vulva).

**{49}** Other state courts have also held that references to "sexual intercourse" or "vaginal intercourse" in their CSP statutes are intended to include penetration of the vulva, based on the conclusion that their statutes were intended to reflect the common law crime of rape. *See, e.g.*, *State v. Albert*, 750 A.2d 1037, 1043-45 (Conn. 2000) (holding that under Connecticut's CSP statute, the term "sexual intercourse" includes penetration of the labia majora, based on the traditional common law definition of rape); *Wilson v. State*, 752 A.2d 1250, 1255 (Md. Ct. Spec. App. 2000) ("The use of the term 'vaginal intercourse' by [the Maryland statutory scheme] does not require any penetration, even slight penetration, into the literal vaginal canal itself. The penetration required remains simply the vulvar penetration that has always been required to prove common law rape."); *see also* James L. Rigelhaupt, Jr., Annotation, *What Constitutes Penetration in Prosecution for Rape or Statutory Rape*, 76 A.L.R.3d 163 § 3, 178-83 (1977) (listing cases which recognize that penetration of the vulva constitutes rape). We find these authorities persuasive, and conclude that the term "sexual intercourse" in Section 30-9-11(A) is intended to codify the common law definitions of rape which includes penetration of the vulva even when the vaginal canal is not penetrated.

**{50}** We note that our interpretation of the term "sexual intercourse" is consistent with the

other related provisions in Section 30-9-11(A). *See Smith v. Ariz. Pub. Serv. Co.*, 2003-NMCA-097, ¶ 5, 134 N.M. 202, 75 P.3d 418 (stating that an appellate court will interpret the provisions of a statute in light of other provisions of the act in order to produce a "harmonious whole"). The language of the final provision in Section 30-9-11(A) prohibits the "penetration, to any extent and with any object, of the genital or anal openings of another." We rely on the ordinary meaning of the terms "genital" and "opening," in support of our interpretation of this statutory language. *See State v. Ogden*, 118 N.M. 234, 242, 880 P.2d 845, 853 (1994) ("The words of a statute, including terms not statutorily defined, should be given their ordinary meaning absent clear and express legislative intention to the contrary."). The term "genital opening" includes the vulva. *Albert*, 750 A.2d at 1045-46. We agree with the detailed analysis of these terms in *Albert* and conclude that, based upon the common and ordinary definitions of the words "genital" and "opening," the vulva constitutes a genital opening under Section 30-9-11(A).

**{51}** In light of the historical recognition defining the common law crime of rape and a proper construction of all of the terms of Section 30-9-11(A), we determine that penetration of the vulva constitutes "sexual intercourse" under the New Mexico statute. The instruction given by the district court accurately reflected the statutory law by stating that the jury could find that Defendant committed CSPM if his penis penetrated either L.T.'s vulva or vagina to any extent. Any error in the mistaken alternative instruction given by the district court was harmless and did not constitute reversible error.

**{52}** We note, however, that our UJIs do not clearly state that penetration of the vulva constitutes CSP. UJI 14-982 provides that "[s]exual intercourse means the penetration of the vagina, the female sex organ, by the penis, the male sex organ, to any extent." The committee commentary states that the definition of sexual intercourse is the legal definition of that element of rape. *Id.* By referring to the common-law crime of rape, the commentary suggests that the word "vagina" is meant in the broader sense of the female genitalia as opposed to just the vaginal canal. UJI 14-981 defines "vagina" specifically as the "canal or passage for sexual intercourse in the female, extending from the vulva to the neck of the uterus" and goes on to separately define the "vulva" as "the external parts of the female organ of sexual intercourse" including the "major and minor lips, the clitoris and the opening of the vagina." The language that the vagina extends "from the vulva" could be read two ways. It could be interpreted to mean that the vagina extends from the beginning of the vulva, thereby including the vulva within the definition of "vagina." Or, it could be interpreted to mean that the vagina begins where the vulva ends, thereby excluding the vulva and, as such, defining "vagina" as the lower vaginal canal to the neck of the uterus. This second reading of UJI 14-982 in conjunction with UJI 14-981 would suggest that the uniform jury instructions are in conflict with the statutory definition of sexual intercourse, since they suggest that sexual intercourse requires penetration of the vaginal canal and is not achieved by penetration of the vulva alone. As a service to the bar, we believe that UJI 14-982 would accurately reflect the law if it is modified to provide that "sexual intercourse means penetration of the *vulva or* vagina, the female sex organ, by the penis, the male sex organ, to any extent." *Cf. State v. Mantelli*, 2002-NMCA-033, ¶ 48, 131 N.M. 692, 42 P.3d 272 (noting that this Court may call into question the correctness of UJIs that have not been addressed in an opinion of our Supreme Court and making a suggestion for an appropriate modification of a UJI). Alternatively, modifying the definition of vagina in UJI 14-981 as

"extending from the *beginning of the* vulva to the neck of the uterus" would effectuate the same clarification. *Id.*

**The Jury Instructions on Unanimity**

**{53}** Defendant contends that the district court's instruction on unanimity was insufficient to actually ensure that the jury was unanimous. Defendant cites no legal authority in support of this argument in his brief in chief, and we therefore decline to address this argument. *See* Rule 12-213(A)(4) NMRA (requiring the brief in chief to contain "an argument which, with respect to each issue presented, shall contain a statement of the applicable standard of review, [and] the contentions of the appellant . . . with citations to authorities"); *In re Adoption of Doe*, 100 N.M. at 765, 676 P.2d at 1330 (stating that "[i]ssues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal," and that an appellate court will not do basic legal research for counsel).

**The Prosecutor's Conduct**

**{54}** At trial, the prosecutor made several statements that Defendant contends constituted misconduct warranting reversal. When an issue of prosecutorial misconduct is preserved by an objection at trial, we review the district court's ruling for an abuse of discretion. *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728 (filed 1999). "An isolated, minor impropriety ordinarily is not sufficient to warrant reversal . . . because a fair trial is not necessarily a perfect one[.]" *Id.* (internal quotation marks and citations omitted). If no objection was raised at trial, we review for fundamental error. *Id.* "Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Id.* (internal quotation marks and citation omitted).

**{55}** On cross-examination of Defendant's mother, in an attempt to establish that she was biased in Defendant's favor, the prosecutor asked whether Defendant's mother and father were paying his attorney's fees. Defendant objected on grounds of relevance and moved for a mistrial. The district court denied the request for a mistrial and, in the presence of the jury, directed the prosecutor to withdraw the question. The prosecutor did so, and asked whether Defendant's mother would be willing to help her son in a time of need. Defendant asserts that the question improperly commented on his invocation of his constitutional right to counsel and that the question "implied to the jury that [Defendant] had obtained high cost representation necessitated by his guilt."

**{56}** We disagree. In context, it is clear that the question was intended to suggest bias and that the question was not one involving post-arrest conduct that might give rise to an inference that Defendant believed he was guilty because he invoked his right to counsel. *Cf. id.* ¶ 32 (noting that when a defendant invokes his right to counsel when questioned by the police, testimony about the invocation of that right may deprive a defendant of a fair trial in the same manner as a comment on a defendant's invocation of his right to remain silent). The district court did not abuse its discretion in requiring the prosecutor to withdraw the question and ask the witness in another manner about any bias she may have for her son.

19

**{57}**    Defendant also asserts that the prosecutor improperly attacked the integrity of defense counsel when she implied that defense counsel was concealing evidence.  The prosecutor prefaced a question to Defendant's expert with "[i]sn't it true you told me before when I had a chance to interview you for five minutes in the hall a couple days ago."  Defendant objected, and the district court sustained the objection.  Later, when moving Defendant's school records into evidence, the prosecutor stated, "They're from [defense counsel].  [The jury] can decide for themselves if they're complete or not."  Defendant objected, not to the admission of the documents, but to the prosecutor's comment, which he contended shifted the burden of proof by suggesting that Defendant was required to provide complete records to establish his innocence.  The district court did not rule on the objection and admitted the documents into evidence.  Defendant did not ask that the jury be instructed about the burden of proof at that time.  The district court did not abuse its discretion by sustaining Defendant's objection to the prosecutor's statement about her interview with Defendant's expert.  In addition, the district court was not obligated to provide relief that Defendant did not seek in response to the prosecutor's comment about interviewing Defendant's expert or about the school records.

**{58}**    Defendant asserts that two other statements by the prosecutor improperly appealed to the passions of the jury.  The first was during cross-examination of L.T.'s father.  The State asked whether L.T.'s father remembered that during a pretrial interview he failed to tell the State that he knew of Defendant's penis piercing.  L.T.'s father responded, "What I remember the most about this interview is that you were a witch . . . [y]ou acted like I was the one on trial."  The State began to respond by saying, "I'm just trying to defend your daughter[.]"  Defendant objected, stating, "Your honor . . . it's argument."  The district court instructed L.T.'s father that he should just answer the questions asked, and not make unsolicited statements.  Defendant made no further objection.  While we do not believe that the State should have suggested that its role is to "defend" an alleged victim during the trial, it does not appear that Defendant preserved an objection on this basis, and we cannot conclude that the statement deprived Defendant of a fair trial.

**{59}**    The second statement that Defendant argues improperly appealed to the passions of the jury was when the State asked Defendant a question that began with the hypothetical: "Assuming for a minute you did sexually abuse [L.T.]."  Defendant objected, and the district court sustained the objection.  The district court did not abuse its discretion in sustaining the objection, and Defendant sought no other relief.  Again, we cannot conclude that this partial question, which was properly rejected by the district court, deprived Defendant of a fair trial.

**{60}**    Although we conclude that none of these statements by the prosecutor alone warrants reversal, Defendant contends that the cumulative effect of the prosecutor's conduct was to deprive him of a fair trial.  Defendant relies on *State v. Ashley*, 1997-NMSC-049, ¶¶ 13, 15-21, 124 N.M. 1, 946 P.2d 205, in which the New Mexico Supreme Court held that the defendant was deprived of a fair trial by the cumulative effect of the prosecutor's improper introduction of evidence that the defendant had a criminal history that extended over forty years; the prosecutor's attack on the defendant's character that pointed out to the jury that he had left his wife and child destitute and forced them to go on food stamps—welfare benefits for which the prosecutor suggested that the jurors, as taxpayers would have to pay; and the prosecutor's improper eliciting of a law enforcement officer's opinion on the

20

ultimate question of the defendant's guilt. *Ashley* does not support Defendant's argument. There, the defendant was accused of bigamy, and the only issue in the case was whether he knew that his divorce from his first wife had never been finalized. *Id.* ¶ 4. The prosecutor's conduct was clearly egregious and prejudiced the defendant in a case in which the only question to be decided was one that depended in part on whether the jury believed that the defendant was the sort of person who would wilfully ignore one legal relationship in forming another. *See id.* ¶¶ 4, 21. Here, the prosecutor's comments were more isolated and did not involve the introduction of significant improper evidence that should have swayed the jury on the essential issues in the case. We conclude that the prosecutor's improper conduct did not deprive Defendant of a fair trial.

**CONCLUSION**

**{61}** We hold that the two factually indistinguishable counts of vaginal CSPM and the two factually indistinguishable counts of anal CSPM violated Defendant's constitutional right to due process. Accordingly, we reverse Defendant's conviction for one count of vaginal CSPM and one count of anal CSPM. We remand to the district court with instructions to dismiss these two convictions and to amend Defendant's judgment and sentence to accurately reflect the dismissal of these two counts of CSPM. As we are not persuaded by Defendant's remaining claims of error, his remaining convictions are affirmed.

**{62}    IT IS SO ORDERED**.

                                                  _____

                                                  **TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Chief Judge**

_____
**JAMES J. WECHSLER, Judge**

**Topic Index for *State v. Tafoya*, No. 28,019**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-CE | Cumulative Error |
| AE-FE | Fundamental Error |
| AE-HE | Harmless Error |
| | |
| **AT** | **ATTORNEYS** |
| AT-CT | Comments by Attorneys at Trial |
| AT-EA | Effective Assistance of Counsel |
| | |
| **CD** | **CHILDREN** |
| CD-PS | Psychological Evaluation |

| | |
|---|---|
| **CT** | **CONSTITUTIONAL LAW** |
| CT-DP | Due Process |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CP | Criminal Sexual Penetration |
| CL-SE | Sexual Exploitation of Children |
| CL-SX | Sexual Offenses |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CW | Children as Witnesses |
| CA-DC | Dismissal of Charges |
| CA-DU | Due Process |
| CA-EA | Effective Assistance of Counsel |
| CA-EO | Elements of Offense |
| CA-JI | Jury Instructions |
| CA-SE | Substantial or Sufficient Evidence |
| CA-TL | Time Limitations |
| | |
| **EV** | **EVIDENCE** |
| EV-CH | Children as Witnesses |
| EV-HR | Hearsay Evidence |
| EV-SS | Substantial or Sufficient Evidence |
| | |
| **JI** | **JURY INSTRUCTIONS** |
| JI-CJ | Criminal Jury Instructions |
| JI-MS | Modification of Jury Instructions |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |