This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                                          **No. 33,376**

**MARVIN ROMERO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Jeff F. McElroy, District Judge**

Hector H. Balderas, Attorney General
Olga Serafimova, Assistant Attorney General
Margaret McLean, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Tania Shahani, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**SUTIN, Judge.**

{1}     A jury found Defendant Marvin Romero guilty of driving while under the influence of alcohol (DWI) contrary to NMSA 1978, Section 66-8-102(C)(1) (2010). Because Defendant had at least seven prior DWI convictions, he was sentenced pursuant to Section 66-8-102(J) to three years of imprisonment, with one year suspended for a total of two years of incarceration. Defendant seeks reversal of his conviction on the grounds that: (1) expert testimony was improperly admitted, (2) the district court erred in denying his motion for a directed verdict, (3) the bureau chief of the toxicology division of the Scientific Laboratory Division (SLD) should not have been permitted to testify regarding Defendant's breath alcohol content because SLD benefits financially from DWI convictions, (4) the district court erred in denying his motion to suppress an officer's testimony, (5) the district court erred in disqualifying a Spanish-speaking juror, and (6) his right to a speedy trial was violated. Defendant also seeks to have his sentence vacated and the issue of sentencing remanded to the district court on the ground that the district court miscalculated Defendant's pre-sentence confinement time. We hold that Defendant has failed to demonstrate any basis for reversal of his conviction or his sentence. We affirm.

**BACKGROUND**

{2}     Defendant's neighbor, Augustin Apodaca, testified that at around 7:00 p.m. on April 22, 2011, Defendant arrived at home and spent the next three to four hours "on

2

a rampage" during which Defendant switched back and forth between his two vehicles, doing donuts and causing gravel to fly everywhere, and ramping over wood piles. In response to Defendant's conduct, Mr. Apodaca eventually called the police. Officer Elias Montoya of the New Mexico State Police testified that at 10:13 p.m. he received a call from dispatch regarding an individual "doing donuts," and after traveling for half an hour, he arrived at the scene at 10:43 p.m.

**{3}** When Officer Montoya arrived at the residence, Defendant was inside his home making something to eat. Officer Montoya used a voice recorder to record his encounter with Defendant, and the recording was played for the jury at trial. Defendant told Officer Montoya that he had been inside his home for five minutes and that he had not had anything to eat or drink since he had been inside. Defendant explained to Officer Montoya that he had been working out of town and that it was his weekend off, he had been drinking, and he admitted that when he came in, he was driving fast, had done some donuts, and kicked up some rocks. He also stated that he had purchased two half pints of whiskey and that he drank them before he arrived at home. Officer Montoya did not see any alcohol inside Defendant's home.

**{4}** Officer Montoya had Defendant perform two standardized field sobriety tests, informing Defendant that his reason for doing so was that he wanted to see whether Defendant had been "okay to drive." Defendant performed poorly on both field

3

sobriety tests. Following the field sobriety tests, Officer Montoya arrested Defendant for DWI.

{5} Defendant's breath-alcohol content (BAC) was tested twice at the police station. The first test, taken at 1:24 a.m. revealed that Defendant had a BAC of .17g/210L. The second test, taken at 1:26 a.m. revealed that Defendant had a BAC of .16g/210L.

{6} Dr. Rong-Jen Hwang, the Toxicology Bureau Chief of SLD testified as an expert in forensic toxicology. Using a formula that has been generally accepted in the field of forensic toxicology since 1932, Dr. Hwang was able to "calculate back" Defendant's BAC to 12:13 a.m., two hours after Officer Montoya was dispatched to the residence. Based on his calculation, Dr. Hwang concluded that at 12:13 a.m. Defendant's BAC "was at least above a .08."

{7} Based in part on the foregoing, a jury found Defendant guilty of violating Section 66-8-102(C)(1) pursuant to which it is unlawful for a person to drive a motor vehicle if the person has an alcohol concentration of .08 or more in his blood or breath within three hours of driving as a result of having consumed alcohol before or while driving.

{8} Defendant appeals his conviction, raising numerous claims of error as grounds for reversal, and as an alternative, seeking remand for an adjustment to his sentence. We conclude Defendant's conviction was supported by sufficient evidence, including

4

Dr. Hwang's admissible testimony. We further conclude that the district court did not err in denying Defendant's motion to suppress or his motion to dismiss for a violation of his right to a speedy trial. Nor did the court err in excusing a prospective juror. Finally, we conclude that Defendant has failed to demonstrate error in regard to his sentence.

**DISCUSSION**

**I. The District Court Did Not Err in Admitting Dr. Hwang's Testimony Regarding Defendant's BAC**

{9} "We review the trial court's evidentiary rulings for [an] abuse of discretion." *State v. Christmas*, 2002-NMCA-020, ¶ 8, 131 N.M. 591, 40 P.3d 1035. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *Id.* (internal quotation marks and citation omitted).

{10} The district court permitted Dr. Hwang to testify as an expert in forensic toxicology regarding Defendant's BAC level. Prior to offering an opinion in this case, Dr. Hwang reviewed Defendant's BAC results and the police report. From the police report, Dr. Hwang understood that the time of the incident was 10:13 p.m., which was the time that Officer Montoya was dispatched to Defendant's residence.

**{11}** Using the "formula" that is generally accepted in the forensic community, Dr. Hwang used Defendant's lowest BAC result, the score of .16 taken at 1:26 a.m., to "calculate back" what Defendant's BAC was at 12:13 a.m., "two hours after the incident." Based on his calculations, Dr. Hwang concluded that at 12:13 a.m., April 23, 2011, Defendant's BAC was at least .08g/210L, and was actually .17g/210L or .18g/210L.

**{12}** Dr. Hwang testified that his calculations were premised on the following assumptions. Dr. Hwang assumed that from "the time of the incident" at 10:13 p.m. to the time that Defendant's breath was tested Defendant had not had anything to eat or drink. Dr. Hwang also assumed that Defendant was in a post-absorptive stage at 12:13 a.m., two hours after "the incident." Although Dr. Hwang assumed that Defendant was in a post-absorptive stage by the time Mr. Apodaca called the police, he also testified that even assuming that Defendant was in a pre-absorptive stage when Mr. Apodaca called the police and when Defendant's BAC was measured, that assumption would not change his conclusion that Defendant's BAC at "around midnight" was above a .08.

**{13}** Although Dr. Hwang did not explain it, the term "post-absorptive" refers to one of three points on the "BAC curve." In turn, the phrase "BAC curve" refers to the scientific principle that when alcohol is consumed, it is processed by the body in three

6

stages, pre-absorptive, peak, and post-absorptive. *See, e.g.*, *State v. Downey*, 2008-NMSC-061, ¶¶ 17, 20, 145 N.M. 232, 195 P.3d 1244 (discussing the three stages of the BAC curve). In other words, "when alcohol is ingested, it is absorbed by the body until a peak BAC is reached, and then it is eliminated from the body by the breath, sweat, liver, or kidneys." *Id.* ¶ 20 (relating the testimony of a pharmacist and professor emeritus at the University of New Mexico School of Medicine as to how alcohol is processed by the human body).

{14} Dr. Hwang did not offer any opinion as to what Defendant's BAC was at the time that he was driving nor did he offer any opinion as to whether Defendant was in a pre-absorptive or post-absorptive stage at 10:13 p.m. In response to defense counsel's questions on cross-examination, Dr. Hwang testified that according to scientific literature, the majority of people who are involved in DWI traffic stops are in the post-absorptive stage already; however, Dr. Hwang clarified that he had no way of knowing whether Defendant fit within that majority, and he offered no opinion to that effect.

{15} Defendant argues that the district court erred by allowing Dr. Hwang's testimony as to Defendant's BAC. According to Defendant, Dr. Hwang's testimony was based on an inconclusive time-line and assumptions not supported by the record. Specifically, Defendant argues that the State failed to conclusively establish what time

Defendant was actually driving and that Dr. Hwang's opinion regarding Defendant's BAC at 12:13 a.m. was only incriminating if Defendant was driving at 9:00 p.m. or later because Section 66-8-102(C)(1) prohibits a BAC of .08 or higher within three hours of driving. Defendant argues further that the State failed to prove what time he started or stopped drinking, and what and when he had last eaten, and that it was improper for Dr. Hwang to have assumed that Defendant was in a post-absorptive stage when his BAC was tested. We conclude that the evidence presented in this case fully supported Dr. Hwang's testimony, and therefore, the district court did not err in allowing Dr. Hwang to testify as to Defendant's BAC at 12:13 a.m.

{16} Defendant told Officer Montoya that he had consumed his alcohol before he arrived at home. Based upon Mr. Apodaca's testimony, the 10:13 p.m. dispatch call that Officer Montoya received, Officer Montoya's arrival time at Defendant's home, and Defendant's statement to Officer Montoya that he had been inside his house for five minutes, it is reasonable to infer that Defendant arrived home around 7:00 p.m., having already consumed his alcohol, and that from 7:00 p.m. until around 10:38 p.m. Defendant drove his trucks in a "rampage" manner causing gravel to fly everywhere. Further, based upon Defendant's statement to Officer Montoya that he had not had anything to eat or drink since he had been inside his home and when the officers arrived, he was making something to eat, a reasonable inference is that Defendant had

8

not eaten anything since at least 10:38 p.m. Finally, although Dr. Hwang stated that he assumed Defendant was in a post-absorptive stage when his BAC was measured at the police station, he also testified that even were he to assume that Defendant was in a pre-absorptive stage, his conclusion that Defendant's BAC was at least .08 at around midnight would be the same. In light of Dr. Hwang's testimony that whether Defendant was in a pre-absorptive or post-absorptive stage at the police station, his conclusion regarding Defendant's BAC at around midnight would be the same renders the propriety of his assumption one way or the other irrelevant in the context of this case.

**{17}** Defendant analogizes this case to *Downey*, 2008-NMSC-061, ¶¶ 1, 33-34, and claims that here, as in *Downey*, reversal is warranted because the expert did not have the facts necessary to plot Defendant's placement on the BAC curve, and therefore, he could not determine whether Defendant was under the influence of intoxicating liquor when he was driving.

**{18}** In *Downey*, the defendant caused a fatal collision at approximately 7:00 p.m. *Id.* ¶ 2. Six hours later, at approximately 1:00 a.m., the defendant's blood was drawn revealing a BAC of .04. *Id.* ¶ 10. In the interim between the time of the collision and the time of the blood draw, the defendant left the scene of the collision for approximately ten minutes, and when he returned to the scene, he was observed

9

walking alongside the roadway and sitting in his truck. *Id.* ¶ 36. He was not in the custody or control of the police, nor was he under their supervision until approximately 10:00 p.m. *Id.* Although there was no evidence of when the defendant had started or stopped drinking, the expert assumed that the defendant had stopped drinking prior to the collision and had not consumed any alcohol after the collision. *Id.* ¶¶ 31, 34. Based on these assumptions, the expert assumed that the defendant was in a post-absorptive stage when his BAC was tested, and the expert used a relation-back calculation to conclude that the defendant's BAC at the time of the collision was between .075 to .11. *Id.* ¶ 31. Our Supreme Court held that the expert's assumption as to when the defendant had consumed alcohol was not supported by facts in the record, and his conclusion regarding the defendant's BAC at the time of the collision was, therefore, "nothing more than mere conjecture[.]" *Id.* ¶ 34. Accordingly, the court vacated the defendant's conviction and remanded for a new trial. *Id.* ¶ 1. In so doing, however, our Supreme Court distinguished the facts in *Downey* from those of *State v. Hughey*, 2007-NMSC-036, ¶¶ 10, 15, 142 N.M. 83, 163 P.3d 470, in which the Court determined that the district court had improperly excluded expert testimony. *Downey*, 2008-NMSC-061, ¶ 37.

{19} In *Hughey*, the defendant told the police the time at which she had stopped drinking. 2007-NMSC-036, ¶ 15. Based on the assumption that the defendant had

stopped drinking at the stated time, the Court concluded that the expert could reasonably infer when the defendant had reached her peak BAC and thereby estimate her BAC at the time that the defendant was driving. *See Downey*, 2008-NMSC-061, ¶ 37 (discussing *Hughey*, 2007-NMSC-036, ¶ 15). The *Hughey* Court concluded that insofar as the expert's testimony was based upon reasonable inferences drawn from the evidence, the question whether the defendant was guilty of driving under the influence was a matter to be resolved by the jury. 2007-NMSC-036, ¶ 15.

{20}    As discussed earlier, Defendant told Officer Montoya that he drank two half pints of whiskey before he arrived home, and Mr. Apodaca testified that Defendant arrived home at approximately 7:00 p.m. This and other evidence that was known to Dr. Hwang permitted him to draw reasonable inferences about when Defendant consumed alcohol in relationship to when he drove his vehicles after returning home. Thus, the facts in the present case more closely resemble the facts in *Hughey* than those in *Downey*, and *Hughey* supports the district court's decision to admit Dr. Hwang's testimony. Furthermore, the present case comes within the view expressed in *State v. Day*, 2008-NMSC-007, ¶ 24, 143 N.M. 359, 176 P.3d 1091, that the circumstances, "viewed in the light most favorable to the verdict, [the expert's testimony] . . . could well have informed the jury's verdict that [the d]efendant's BAC was 0.08 or higher at the [critical time]." In sum, we cannot conclude that the district

11

court abused its discretion in admitting Dr. Hwang's opinion as to Defendant's BAC at 12:13 a.m.

**II.     The District Court Properly Denied Defendant's Motion for a Directed Verdict**

{21}     "We review denials of directed verdicts by asking whether sufficient evidence was adduced to support the underlying charge." *State v. Johnson*, 2010-NMSC-016, ¶ 57, 148 N.M. 50, 229 P.3d 523 (internal quotation marks and citation omitted). In reviewing the sufficiency of the evidence, we consider "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt" when the evidence is viewed as a whole and all reasonable inferences in favor of the jury's verdict are indulged. *Id.* (internal quotation marks and citation omitted).

{22}     In order to prove that Defendant was guilty of the crime charged, the State was required to establish beyond a reasonable doubt that within three hours of operating a motor vehicle, Defendant had an alcohol concentration of .08 g/210L or more as a result of having consumed alcohol before or while driving. *See* § 66-8-102(C)(1). Based on the premise that the district court erred in admitting Dr. Hwang's testimony, Defendant argues that the court should have granted his motion for a directed verdict on the ground that there was no evidence that Defendant's BAC was at or above .08 within the relevant time period.

{23}     The unmistakable propriety of the jury's verdict in this case is confirmed by the testimony of the expert which, contrary to what Defendant contends, was properly admitted by the district court. Moreover, even were we to have held that Dr. Hwang's testimony was inadmissible, we would affirm Defendant's conviction based on other evidence presented at trial. From the evidence at trial, the jury could reasonably have concluded that Defendant consumed his alcohol before 7:00 p.m. and that he drove from 7:00 p.m. until approximately 10:38 p.m. Within three hours of the 10:38 p.m. driving time, Defendant's BAC was measured twice, revealing that at 1:24 a.m. his BAC was .17 and that at 1:26 a.m. his BAC was .16. Based on the foregoing, even without considering Dr. Hwang's testimony, we would conclude that the jury's verdict was supported by sufficient evidence.

**III.     Allowing Dr. Hwang to Testify Did Not Violate Defendant's Right to Due Process**

{24}     Defendant argues that the district court violated his due process rights by allowing Dr. Hwang to testify because a person convicted of DWI is statutorily required to pay an $85 fee, and all fees collected are statutorily designated as "funding" for SLD. *See* NMSA 1978, § 31-12-7(A) (2010) (assessing the $85 fee); NMSA 1978, § 31-12-9 (1991) (providing that all fees collected pursuant to Section 31-12-7(A) are appropriated for payment to the SLD "for costs related to chemical and other tests and analyses"). Defendant contends that as a result of this statutory scheme,

Dr. Hwang was a "contingency fee witness" and that the court therefore violated Defendant's due process rights by allowing Dr. Hwang to testify. We review due process claims de novo. *State v. Tafoya*, 2010-NMCA-010, ¶ 7, 147 N.M. 602, 227 P.3d 92.

{25} Defendant's attempt to characterize Dr. Hwang as a contingency fee witness based solely on the legislative scheme discussed here is not persuasive. Dr. Hwang testified that the $85 fee was a legislative matter that had nothing to do with him, personally. There is no evidence that Dr. Hwang personally profited from Defendant's conviction in this case. To the extent that Defendant's due process argument derives from the notion that Dr. Hwang was motivated by self-interest to provide false or misleading testimony in order to assure Defendant's conviction and thereby add to the payment of fees to SLD, the matter was to be addressed through cross-examination and not by excluding Dr. Hwang's testimony. *See State v. Brown*, 1984-NMSC-014, ¶ 14, 100 N.M. 726, 676 P.2d 253 ("Matters affecting the witness's bias or motive to testify falsely are to be attacked through cross-examination, rather than the exclusion

of a witness."). Defendant's citation to inapplicable, non-binding authorities[1] does not persuasively demonstrate a due process violation.

**IV.     The District Court Properly Denied Defendant's Motion to Suppress**

{26}     At trial, Defendant argued that Officer Montoya made an illegal warrantless entry into Defendant's home, and therefore, statements and evidence that were collected after the entry should be suppressed. The district court denied the suppression motion on the ground that Defendant voluntarily admitted Officer Montoya into his home. On appeal, Defendant argues, pursuant to *State v. Franklin*, 1967-NMSC-151, ¶ 9, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, ¶¶ 17-24, 103 N.M. 655, 712 P.2d 1, that the district court erred in denying his motion to suppress. *See Franklin*, 1967-NMSC-151, ¶ 9 ("[G]enerally . . . appointed counsel should set forth contentions urged by a [defendant] whether or not counsel feels they have merit[.]"); *Boyer*, 1985-NMCA-029, ¶ 17 (same).

---

[1] Defendant cites one case in support of his due process argument, *State v. Glosson*, 462 So. 2d 1082 (Fla. 1985). The *Glosson* court held that a trial court may dismiss criminal charges on due process grounds "where an informant stands to gain a contingent fee conditioned on cooperation and testimony in the criminal prosecution when that testimony is critical to a successful prosecution." *Id.* at 1085. Defendant also cites an advisory opinion of the New Mexico State Bar Ethics Committee for the proposition that contingency fee payments to expert witnesses should be prohibited so as to preclude the presentation of expert testimony that is motivated by self-interest. These authorities are not persuasive in the context of this case, and they do not warrant further consideration.

**{27}** "In reviewing a trial court's denial of a motion to suppress, [the appellate courts] observe the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts, which is subject to de novo review." *State v. Hubble*, 2009-NMSC-014, ¶ 5, 146 N.M. 70, 206 P.3d 579 (alteration, internal quotation marks, and citation omitted). "An officer's warrantless entry into a person's home is the exact type of intrusion against which the language of the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution is directed." *State v. Moran*, 2008-NMCA-160, ¶ 7, 145 N.M. 297, 197 P.3d 1079 (internal quotation marks and citation omitted). One exception to the warrant requirement is consent. *State v. Gutierrez*, 2005-NMCA-015, ¶ 11, 136 N.M. 779, 105 P.3d 332.

**{28}** The district court's finding that Defendant voluntarily admitted Officer Montoya into his home is supported by evidence in the record. Officer Montoya testified that he entered Defendant's home only after Defendant invited him in. Officer Montoya's testimony in that regard was supported by the audio recording of his encounter with Defendant in which Defendant audibly invited Officer Montoya to "come on inside." In light of Defendant's invitation to Officer Montoya, the consent exception to the warrant requirement applies in these circumstances. The district court properly denied Defendant's motion to suppress.

16

## V. Excluding the Spanish-Speaking Juror Was Not Reversible Error

{29} Defendant argues that the district court committed reversible error by excluding a monolingual, Spanish-speaking, potential juror without making every reasonable effort to accommodate the juror. Defendant also argues that improperly excluding the Spanish-speaking juror is per se reversible error since the district court overruled a timely objection, citing *State v. Samora*, 2013-NMSC-038, ¶ 18, 307 P.3d 328. We agree with the State that Defendant invited the alleged error, and we do not reach the merits of Defendant's argument.

{30} We review constitutional claims de novo. *See State v. Pacheco*, 2007-NMSC-009, ¶ 12, 141 N.M. 340, 155 P.3d 745. In *State v. Rico*, 2002-NMSC-022, ¶ 11, 132 N.M. 570, 52 P.3d 942, the New Mexico Supreme Court held that Article VII, Section 3 of the New Mexico Constitution "requires that a trial court make every reasonable effort to accommodate a potential juror for whom language difficulties present a barrier to participation in court proceedings." The Court listed several factors to weigh when considering what "constitutes sufficiently reasonable efforts" and stated that "a trial court shall not excuse a juror [who needs an interpreter ] absent a showing that accommodating that juror will create a substantial burden[.]" *Id.* ¶ 12. The Court held specifically that "the [trial] court is under a constitutional obligation to continue the trial for a reasonable time if the continuance will be effective in securing an

17

interpreter." *Id.* ¶ 16. In *Samora*, our Supreme Court expounded on its holding in *Rico*, stating that "[w]hen Article VII, Section 3 is violated and the objection properly preserved, an appellate court is required to reverse what would have been an otherwise valid conviction." *Samora*, 2013-NMSC-038, ¶ 15.

{31} Defendant emphasizes the dearth of evidence in the record regarding the district court's efforts to secure an interpreter for the potential juror and cites the lack of proof of the court's effort as ground for reversible error. Defendant states there is no evidence that the district court contacted surrounding counties to secure an interpreter or considered a continuance until an interpreter was available. However, Defendant is responsible for the lack of evidence in the record regarding what the district court actually did or considered in order to secure an interpreter. After the court informed counsel of the potential juror's excusal and Defendant timely objected, the following colloquy took place.

> Court: Would you like the court to make a record with the court administrators as to what steps we took to try to make accommodations for [the potential juror's] language, or do you accept the court's representation that we did make every effort to get an interpreter here this morning?

> Defense Counsel: I accept the court's representation, but I'm sure the court understands my objection as well.

> Court: I do.

18

**{32}** Thus, the court asked Defendant explicitly if Defendant wanted the court's efforts to secure an interpreter on the record and Defendant declined. Defendant therefore contributed to the condition of which he now complains, namely absence from the record of proof of the court's efforts to secure an interpreter. We decline to reach the merits of this argument because Defendant invited the error of which he now complains. *See State v. Young*, 1994-NMCA-061, ¶ 5, 117 N.M. 688, 875 P.2d 1119 ("[T]o allow a defendant to invite error and to subsequently complain about that very error would subvert the orderly and equitable administration of justice.").

## VI. Defendant's Right to a Speedy Trial Was Not Violated

**{33}** Defendant filed a motion in the district court seeking dismissal of the charge against him on the ground that his right to a speedy trial was violated. The district court denied the motion. On appeal, Defendant reasserts his claim that dismissal was warranted on speedy trial grounds.

**{34}** Determining whether a defendant's speedy trial right has been violated requires a review of the particular circumstances of each case including consideration of the conduct of the prosecution, that of the defendant, and "the harm to the defendant from the delay." *State v. Garza*, 2009-NMSC-038, ¶ 13, 146 N.M. 499, 212 P.3d 387. Our analysis in this regard is guided by considering four factors: "(1) the length of delay[;] (2) the reasons for the delay[;] (3) the defendant's assertion of his right[;] and (4) the

actual prejudice to the defendant that, on balance, determines whether a defendant's right to speedy trial has been violated." *Id.* (internal quotation marks and citation omitted). On appeal from an order denying a motion to dismiss for a violation of a defendant's right to a speedy trial, "we give deference to the district court's factual findings, but we review the [speedy trial] factors de novo." *State v. Spearman*, 2012-NMSC-023, ¶ 19, 283 P.3d 272 (alteration, internal quotation marks, and citation omitted).

**1.      The Length of the Delay**

**{35}**      "The length of delay serves two purposes under the speedy trial analysis." *Id.* ¶ 20. On one hand, it triggers an analysis of the speedy trial factors, and on the other hand, it is, itself, a speedy trial factor to be weighed in the balance. *Id.*

**{36}**      Defendant was arrested and charged with DWI on April 22, 2011. On May 17, 2011, the charge against him was dismissed pending further investigation. The State reinstated the charges on October 24, 2011. Defendant's trial began on July 10, 2013.

**{37}**      In his argument, Defendant assumes that the length of the delay is measured from the time of his arrest to the time of his trial; however, when a charge is dismissed in good faith and later re-filed, the interim delay is not included in a speedy trial analysis. *State v. Hill*, 2005-NMCA-143, ¶¶ 11-12, 138 N.M. 693, 125 P.3d 1175. Nothing in the record proper or in the arguments on appeal indicate that the dismissal

20

and re-filing of the charge against Defendant was done in bad faith. Accordingly, in our speedy trial analysis we consider the relevant period of delay to have occurred between October 24, 2011, when the charge was re-filed and the commencement of trial, July 10, 2013, a period of approximately twenty months.

{38} The district court concluded that this was a simple case. *See State v. Plouse*, 2003-NMCA-048, ¶ 42, 133 N.M. 495, 64 P.3d 522 ("We give due deference to the district court's findings as to the level of complexity."), *abrogated on other grounds by Garza*, 2009-NMSC-038. In a simple case, a delay of one year is considered presumptively prejudicial. *Garza*, 2009-NMSC-038, ¶ 48. Thus, the approximate twenty-month delay in this case requires an examination of the remaining speedy trial factors.

{39} In terms of the weight given to the length of the delay, "the greater the delay[,] the more heavily it will potentially weigh against the [prosecution]." *Id.* ¶ 24. In *State v. Montoya*, this Court held that a delay of six months beyond the triggering date in an intermediate case weighed only slightly against the prosecution. 2011-NMCA-074, ¶ 17, 150 N.M. 415, 259 P.3d 820. In contrast, in *Garza*, our Supreme Court recognized that a delay of five or more years weighed heavily in the defendant's favor. 2009-NMSC-038, ¶ 24. Here, the delay of approximately twenty months, eight months beyond the triggering date, being slightly longer than the six-month delay in

*Montoya*, but significantly shorter than the five to six years recognized in *Garza*, weighs moderately against the State and in Defendant's favor. *See, e.g*, *State v. Steinmetz*, 2014-NMCA-070, ¶¶ 5-6, 327 P.3d 1145 (holding that a delay of twenty-eight months beyond the date of presumptive prejudice in an intermediate case weighed moderately against the prosecution).

**2.      The Reasons for the Delay**

{40}      "Closely related to [the] length of delay is the reason the government assigns to justify the delay." *Garza*, 2009-NMSC-038, ¶ 25 (internal quotation marks and citation omitted). Negligent or administrative delay, caused, for example, by overcrowded courts, the reassignment of judges, or governmental negligence weighs against the prosecution, but not heavily. *Id.* ¶¶ 26, 29.

{41}      Here, the district court concluded that the first fourteen-month period of delay was attributed to a variety of issues that were "essential[ly] systemic and caused by the courts." Accordingly, in weighing the reasons-for-the-delay factor, the court weighed this fourteen-month period "slightly against the State." Defendant's argument reflects his agreement with the court's conclusion that this period of delay was administrative and should be weighed against the State. The district court concluded that the remaining delay, a period of approximately six months, was caused by Defendant's request for a continuance of a February 2013 trial date and subsequent

22

scheduling issues as a result of that continuance. Defendant attempts to parse the reasons for the delay within that six-month period in order to cause the reasons-for-the-delay factor to weigh more heavily against the State. Under the circumstances of this case, we agree with the district court's conclusion that the final six months of delay was attributed to Defendant.

**3.    The Assertion of the Right**

{42}    Defendant asserted his right to a speedy trial twice; first when his counsel entered an appearance and again when new counsel entered an appearance. These pro forma assertions were neither frequent nor forceful, therefore, the assertion-of-the-right factor weighs only slightly in Defendant's favor. *See id.* ¶ 34 (weighing the assertion-of-the-right factor slightly in the defendant's favor because the right was not vigorously asserted); *State v. Fierro*, 2012-NMCA-054, ¶ 53, 278 P.3d 541 (stating that pro forma assertions of the right to a speedy trial that accompany entries of appearance are afforded "relatively little weight" (internal quotation marks and citation omitted)).

**4.    Prejudice**

{43}    The right to a speedy trial is intended to guard against three forms of prejudice: oppressive pretrial incarceration, undue anxiety and concern of the accused, and impairment to the defense. *Garza*, 2009-NMSC-038, ¶ 35. In seeking to establish a

speedy trial violation, it is incumbent upon the defendant to demonstrate and to provide evidence of a causal link between the delay and any alleged prejudice as a result of the delay. *Spearman*, 2012-NMSC-023, ¶ 39.

{44}  Defendant argues that he suffered two forms of prejudice as a result of the delay in bringing his case to trial: compromised liberty as a result of having to wear a "SCRAM bracelet," as well as stress, anxiety, and concern. Defendant fails to provide citations to the record proper to support his assertion that evidence was presented to support his claims of prejudice. *See* Rule 12-213(A)(4) NMRA (requiring an appellant to cite the record in support of each argument). Further because Defendant fails to attack the district court's findings in regard to prejudice, the court's findings are conclusive. *See id.* (stating that where the appellant does not set forth "a specific attack on any finding, [the unattacked] finding shall be deemed conclusive").

{45}  The district court's conclusive findings in regard to the prejudice claimed by Defendant were, in relevant part, that Defendant's movements were not monitored or restricted and that by wearing the "SCRAM unit,"[2] Defendant was spared from regular drug or alcohol tests in person several times a week. For the eleven months leading up to the court's speedy trial order, issued on July 5, 2013, Defendant did not have to

---

[2] SCRAM is an acronym that stands for "Secure Continuous Remote Alcohol Monitoring." The SCRAM unit that Defendant wore was an ankle bracelet that monitored Defendant's alcohol consumption.

wear the SCRAM unit, and he had "essentially no restrictions on his activity[.]" As to Defendant's claims of anxiety or hardship as a consequence of the delay in bringing his case to trial, the district court found "no anxiety and hardship that is not a normal and expected consequence of a pending criminal action." The court found that although Defendant had not been employed since June or July 2012, his lack of employment and the related adverse effects thereof were "primarily due to economic factors or [to] Defendant's numerous previous DWI convictions." Finally, as to the anxiety that Defendant suffered as a result of the fact that his neighbor was a witness for the State, the court found that circumstance to be "not extraordinary or unusual in this type of case." In sum, the court found that Defendant failed to make a particularized showing of prejudice as a result of the delay in bringing his case to trial.

**5.     Balancing the Factors**

{46}     To summarize, we conclude that the length of the delay weighs moderately in Defendant's favor, that the reasons-for-the-delay factor weighs slightly against the State as a result of the fourteen-month administratively caused delay, and that the assertion-of-the-right factor weighs only slightly in Defendant's favor. We also conclude that Defendant has failed to demonstrate prejudice as a result of the delay in bringing his case to trial. Without a showing of prejudice and with the other three

factors not weighing sufficiently heavy in Defendant's favor, Defendant has failed to demonstrate that the alleged speedy trial violation warrants reversal of his conviction.

**VII.   Defendant Was Not Entitled to Presentence Confinement Credit**

{47}    Defendant argues that the district court erred in sentencing him because the court failed to include presentence confinement credit for the time Defendant spent in jail and the time he spent wearing the SCRAM unit. We review whether a defendant qualifies for presentence confinement credit de novo. *See State v. Guillen*, 2001-NMCA-079, ¶¶ 6, 9, 130 N.M. 803, 32 P.3d 812 (analyzing presentence confinement credit for time spent wearing an electronic ankle monitor as a matter of statutory interpretation). NMSA 1978, Section 31-20-12 (1977) provides that a defendant "held in official confinement on suspicion or charges of the commission of a felony shall, upon conviction of that or a lesser included offense, be given credit for the period spent in presentence confinement against any sentence finally imposed for that offense." In *State v. Fellhauer*, this Court held that time spent outside of jail qualifies as official confinement if

> (1) a court has entered an order releasing the defendant from a facility but has imposed limitations on the defendant's freedom of movement, or the defendant is in the actual or constructive custody of state or local law enforcement or correctional officers; and (2) the defendant is punishable for a crime of escape if there is an unauthorized departure from the place of confinement or other non-compliance with the court's order.

1997-NMCA-064, ¶ 17, 123 N.M. 476, 943 P.2d 123 (emphasis omitted).

{48} The district court found that the first prong of the *Fellhauer* test was not met because Defendant's freedom of movement was not actually limited or restricted by the SCRAM unit. Defendant rebuts the court's conclusion, arguing that he was required to obtain permission before leaving his home, that his employer was required to submit Defendant's work schedule, and that Defendant was required to "check in" with the Human Resources Development Association (HRDA) multiple times a week, and that these conditions sufficiently impinged his freedom of movement under the first prong of the *Fellhauer* test. The State responds that the only actual restriction on Defendant's movement was that he was not allowed to leave the State of New Mexico without prior approval and that that condition alone does not satisfy the first prong of the *Fellhauer* test.

{49} We hold that Defendant's freedom of movement was not limited to a sufficient degree to qualify as official confinement under *Fellhauer*. The record shows that the only restriction on Defendant's freedom of movement was that he was not allowed to leave the State of New Mexico without prior permission of the court. In *Fellhauer*, the defendant was under house arrest and was not allowed to leave Bernalillo County without court permission. *Id.* ¶ 2. Thus, the conditions in *Fellhauer* were more stringent than the ones imposed on Defendant in this case, yet this Court held that the conditions in *Fellhauer* did not qualify as official confinement. *Id.* ¶¶ 19-20. We

27

cannot hold that Defendant is entitled to presentence credit under conditions more lax than those in *Fellhauer*.

{50} Defendant compares his circumstances to that of the defendant in *Guillen*, where that defendant was subject to electronic monitoring. 2001-NMCA-079, ¶¶ 2-3. However, the fact that the defendant in *Guillen* was subject to electronic monitoring did not affect this Court's analysis. Rather, we stated that "the critical question" was whether the condition that the defendant "remain at his home at all times except to attend alcohol counseling, work, or religious services" sufficiently limited the defendant's freedom of movement to meet the first part of the *Fellhauer* test. *Guillen*, 2001-NMCA-079, ¶ 8 (internal quotation marks omitted). Defendant here was not subject to similar restrictions. Defendant nevertheless argues that he was required to obtain permission before leaving his home. That statement mischaracterizes the testimony at trial. Defendant was required to call and inform HRDA when he left or returned home in order to ensure the SCRAM unit was functioning properly. He was not required to obtain permission to come and go; he was only required to inform HRDA when he was coming or going. The SCRAM unit's purpose was not to monitor and constrain Defendant's whereabouts, but to monitor Defendant's alcohol consumption, and Defendant needed to inform HRDA when he left and returned home in order to ensure that the unit's readings were electronically sent to HRDA. Unlike

28

the defendant in *Guillen*, these conditions did not impose limitations on Defendant's freedom of movement. As such, we hold Defendant is not entitled to presentence confinement credit for time spent wearing the SCRAM unit.

{51} Defendant also asserts, without a statement of preservation, without citation to the record or to any authority, and without developing an argument, that he is entitled to presentence confinement credit for two and a half weeks spent under house arrest and fourteen days credit for time actually spent in the Taos Detention Center. *See* Rule 12-213(A)(4) (stating that, as to each argument, the appellant must provide a statement of preservation, citations to the record proper, and citations to relevant authorities). Because Defendant has failed to develop his argument and failed to comply with Rule 12-213(A)(4), we decline to consider this issue. *See State v. Stephenson*, 2015-NMCA-038, ¶ 24, 346 P.3d 409 (stating that this Court will not address undeveloped arguments that are not supported by authority), *cert. granted*, 2015-NMCERT-001, ___ P.3d ___; *State v. Lopez*, 2009-NMCA-127, ¶ 14, 147 N.M. 364, 223 P.3d 361 (stating that the appellate court may decline to address an argument on appeal as to which the appellant has failed to comply with Rule 12-213).

**CONCLUSION**

{52} We affirm.

{53} **IT IS SO ORDERED.**

29

_____

**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____

**TIMOTHY L. GARCIA, Judge**

_____

**J. MILES HANISEE, Judge**