## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2017-NMCA-026

Filing Date: November 29, 2016

Docket No. 33,692

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

JORGE BERNARDO HUERTA-CASTRO,

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Fernando R. Macias, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**KENNEDY, Judge.**

**{1}**    Defendant was convicted of twelve counts of criminal sexual penetration of a minor. Six of these counts of the indictment pertained to one child, and six to another. Otherwise, all twelve charges in the indictment were exact duplicates with precisely the same language. Defendant's motion for a bill of particulars was denied prior to trial; his motion for a directed verdict was denied. Defendant now asserts on appeal that these identical counts violated his right to due process and subjected him to double jeopardy. We agree. As such, ten of the twelve charges against Defendant are dismissed. The remaining two charges are

1

supported by sufficient evidence and would be affirmed but for cumulative error that caused prejudice to Defendant. Reversed and remanded for retrial on one count as to each victim.

## I.    BACKGROUND

{2}    Defendant was indicted on twelve counts of criminal sexual penetration of a minor (CSPM). Six of the twelve counts read as follows:

> [O]n, about or between August 15, 2012, and October 13, 2012, in Dona Ana County, the above-named defendant did cause [Child 1] to engage in sexual intercourse and/or caused the insertion of any object into the intimate part of [Child 1], and [Child 1] was twelve years of age or younger, a first degree felony, contrary to § 30-9-11(D)(1), NMSA 1978.

In the remaining six counts, the first two references to Child 1's name were replaced with Child 2's name.[1] Other than the name substitution, all twelve counts were indistinguishable. The State acknowledged that all references to Child 1 in counts seven through twelve should have referenced Child 2, and it later amended its indictment to correct the naming error on counts seven through twelve, resulting in two sets of six identical counts as to each child.

### Motion for a Bill of Particulars (Statement of Facts)

{3}    Defendant filed a motion for a bill of particulars. The district court held a hearing on the motion, during which Defendant requested more particularity on each of the twelve counts. Specifically, defense counsel requested details regarding the time, date, location, and actions alleged in each count of the indictment. Characterizing the indictment as a "shotgun indictment," defense counsel explained to the district court that it was unclear what he was defending against in each count, and as such, he could not effectively defend against any of the counts. The inability to formulate a defense revolved particularly around the time of day of the incidents, whether Defendant might have been at work, what day or week it was, or even whether he was around at these times.

{4}    The State conceded that it could not provide specific dates because of the young ages of Children, but told the court that Children could narrow the incidents by the time of day and in relation to other events. Additionally, the State pointed out that it could provide a beginning and end date for the abuse and could specify that it took place in the home. The State also asserted that it had physical evidence to show when the last incident occurred.

{5}    The district court took note of the young age of Children—six and eight years old at the time of the incidents—and pointed out that the inability of Children to pinpoint a specific

---

[1]The children in this case have the same initials for their first and last names. We will identify them as Child 1 and Child 2 throughout this opinion.

date did not reflect a deficiency in the indictment. The district court based its interpretation of the indictment on its reliance on the State's assertion that witness interviews yet to occur would provide evidence that twelve different incidents occurred. The district court concluded that the issues with the indictment could be resolved through the subsequent interviews and denied Defendant's motion. The district court noted that if, after conducting the interviews, Defendant could provide additional argument regarding the issue, he could file further motions. Defendant did not file any other motion regarding deficiencies in the indictment.

{6}     At trial, the State presented testimony from Child 1, Child 2, their mother (Mother), their grandmother (Grandmother), the investigating detective, and the forensic interviewer. Defendant presented testimony from a pediatrician.  At the time of the alleged abuse, Defendant lived with his girlfriend, Mother, in Las Cruces, New Mexico with Child 1 and Child 2. Mother would leave for work early in the mornings, and Defendant would wake Children and get them ready for school. At trial, Child 1 and Child 2 testified to Defendant putting his penis and fingers in each of their vaginas and anus while their sibling was showering. Both Child 1 and Child 2 testified that Defendant acted in this way more than six times.

{7}     Child 2 testified that Defendant first did these acts to her on "a day before school started." The State's questioning regarding this incident, and Child 2's responses thereto, were specifically limited to Defendant's actions toward her alone. It was not proven when school started, nor that August 15, 2012, was a date relevant to the start of school. Child 2 did not remember when the last incident of this sort occurred, and Child 1 gave no testimony regarding a final incident.

{8}     The State presented some evidence that the alleged abuse ended on October 13, 2012, through the testimony of Grandmother who stated that on that date, Child 1's genital area was red, irritated, and had a rash. Grandmother testified that Child 2 also reported having been abused, though it is unclear when she made this allegation, and Grandmother did not see similar injuries on Child 2. After Grandmother told Mother about the rash and abuse, Mother took Children to the emergency room on October 13, 2012. Children were not examined at that time, but police were dispatched.

{9}     Detective Martinez testified that, based on his interview with Mother while at the hospital, the last incident had occurred six to eight days earlier. However, Detective Martinez later clarified that during subsequent interviews with Mother, he discovered that the last incident had actually occurred fourteen days before Children were taken to the hospital.[2] Children were taken to a forensic interview on October 14, 2012, and they were later examined by a pediatrician on October 30, 2012. The pediatrician indicated that her examination of Children did not reveal any injuries, and that her findings did not necessarily mean that Children were  not sexually abused.

---

[2]Mother's testimony did not lend any clarification to this discrepancy.

**{10}** Once the State rested its case, defense counsel made a motion for directed verdict, pointing out that the State had failed to produce any evidence that the events occurred in the charging period or that six separate incidents occurred as to each child. The district court denied the motion but acknowledged that Defendant's argument had merit because no evidence supported any crime occurring with regard to the charged date of August 15, 2012, and allowed Defendant to argue to the jury that no evidence suggested that the abuse took place within the charging period. The jury found Defendant guilty of all twelve counts of CSPM. Defendant appealed to this Court. Other facts will be discussed as needed in the course of the opinion.

## II. DISCUSSION

**{11}** Defendant alleges that the charging documents in this case violated his right to due process and right to be free from double jeopardy because they lacked the requisite level of specificity. Defendant also asserts that there is insufficient evidence to support his conviction on all twelve counts. We first address Defendant's argument regarding the specificity of the charging documents. Finding reversible error on that issue, we then decide whether sufficient evidence existed to support all or any of the counts in order to satisfy double jeopardy. Finally, we evaluate Defendant's claims that he was prejudiced by the State's failure to turn over exculpatory evidence in a timely manner or by cumulative error.

### A. Adequacy of Notice From Cookie-Cutter Counts and Due Process

**{12}** Defendant first asserts that the district court erred in not granting his motion for a bill of particulars[3] prior to trial, and that at the end of trial, the district court erred in not dismissing charges for the lack of differentiation between them.

**{13}** "The object of a bill of particulars in criminal cases is to enable the defendant to properly prepare his defense, and, to achieve that fundamental purpose, it must state as much as may be necessary to give the defendant and the court reasonable information as to the nature and character of the crime charged[.]" *State v. Mosley*, 1965-NMSC-081, ¶ 4, 75 N.M. 348, 404 P.2d 304 (citation omitted). In cases involving child victims, allegations of criminal behavior often lack specificity as to the date, location, or details of a particular incident within the period of time for which a defendant is charged. *See State v. Vargas*, 2016-NMCA-038, ¶ 39, 368 P.3d 1232. We recognize that because the State has a compelling interest in protecting child victims, our courts can be "less vigorous in requiring specificity as to time and place when young children are involved than would usually be the case where an adult is involved." *Id.* ¶ 40 (internal quotation marks and citation omitted). This flexibility does not, however, permit the State to proceed based on a lack of adequate

---

[3]While the terms "bill of particulars" and "statement of facts" are used interchangeably in our jurisprudence, we note that "statement of facts" is the term adopted in our Rules of Criminal Procedure. *See* Rule 5-205(C) NMRA.

notice of the conduct upon which an indictment is based.

**{14}** Procedural due process requires "the State to provide reasonable notice of charges against a person and a fair opportunity to defend[.]" *State v. Baldonado*, 1998-NMCA-040, ¶ 21, 124 N.M. 745, 955 P.2d 214. This includes a requirement that the State provide defendants with a reasonable ability to protect themselves from being convicted more than once for the same behavior. *State v. Dominguez*, 2008-NMCA-029, ¶ 5, 143 N.M. 549, 178 P.3d 834. In sum, the State is able to proceed with prosecution only for those acts for which it is able to provide a factually distinct basis. *Id.* ¶¶ 10-11. A charging defect encompassed by cookie-cutter allegations within a broad time period operates in two ways to deny a defendant's rights. It gives rise to the possibility that a defendant might suffer double jeopardy in his initial trial by being convicted and punished multiple times on undifferentiated counts for what might have been the same offense, and it renders a defendant unable to plead a specific conviction or acquittal as a bar to future prosecution. *Id.* ¶ 9. Procedurally, Defendant exercised his rights in the three ways in which he could most efficiently raise the issue of lack of specificity in the charges: (1) pre-trial through a motion for a statement of facts under Rule 5-205(C); (2) at the close of the State's case in a motion for directed verdict; and (3) at the close of trial, in a motion to dismiss for lack of sufficient evidence to support all of the counts charged in the indictment. We address each in turn.

**B.      A Statement of Facts Was Improperly Denied; Reversal Is Required**

**{15}** In this case, the indictment charged six factually undifferentiated acts per victim occurring between two dates, about two months apart. Defendant moved for a bill of particulars, citing *Baldonado*, 1998-NMCA-040, ¶¶ 26-29, and preserving the issue for this appeal. *See State v. Altgilbers*, 1986-NMCA-106, ¶ 46, 109 N.M. 453, 786 P.2d 680 (holding that a defendant who does not raise lack of notice by way of requesting a statement of facts before trial has waived a claim to lack of notice). Defense counsel detailed the vagueness and the effect on his inability to formulate a defense. Specifically, Defendant could not ascertain from the charging document around what time of day things might have happened, or relating whether Defendant was at work, what day or week it was, or where he was during these times. As to the incidents charged, counsel said, "they all happened at basically the same time." The motion hearing took just over ten minutes before the district court denied Defendant's motion for a bill of particulars.

**{16}** As defense counsel acknowledged that the indictment's lack of specificity could be due to Children's inability to provide more specific information, the court asked, "Then how do I make that occur; that's not a deficiency in the indictment, that goes to kind of the weight of the evidence that would be presented by the State." With this basis for its decision, the district court mistakenly shifted the focus of our law from a statement of facts that "give[s] the defendant and the court reasonable information as to the nature and character of the crime charged," *Mosley*, 1965-NMSC-081, ¶ 4, to the evidence the State would subsequently provide by way of discovery and at trial to prove the specific allegations. The

5

remedy for an erroneous failure to provide adequate information as to the nature of the charges is reversal, *State v. Graves*, 1963-NMSC-183, ¶ 12, 73 N.M. 79, 385 P.2d 635, and failure to specify individual charges' factual basis is judged at the time the statement of facts is requested, not whether prejudice might have resulted (or been cured) by trial on the merits. *Id*. Thus, any error in denying a bill of particulars occurs at the time of denial, not after evidence is produced at a later time. That principle has not changed, although *Baldonado* and *Dominguez* have since applied this principle to the specific problem of "the proper balance to be struck between the due process imperative to provide reasonable notice of charges against a criminal defendant, and the need to allow the State reasonable leeway in prosecuting crimes committed against children of tender years." *Baldonado*, 1998-NMCA-040, ¶ 1. In *Graves*, our Supreme Court noted that the rule for a bill of particulars "would seem to make it mandatory that certain basic information, not evidence, be furnished." 1963-NMSC-183, ¶ 11. A district attorney is not required to plead evidence in a bill of particulars. *Mosley*, 1965-NMSC-081, ¶ 4. By emphasizing the possibility of the State eventually producing discovery by way of interviews yet to be conducted, or judging the quality of the indicted charges by the weight of evidence to be produced at trial, the district court applied the incorrect legal standard resulting in the court's failure to order a statement of facts as required in *Baldonado*.

**{17}** Our Supreme Court recognized long ago that a bill of particulars is the "means [through which] the right of an accused to appear and defend and to demand the nature and cause of the accusation against him, contained in [Article II, Section 14] of the New Mexico Constitution, is assured." *State v. Campos*, 1968-NMSC-177, ¶ 11, 79 N.M. 611, 447 P.2d 20. In *Campos*, relying on *Graves*, our Supreme Court "recognized that if a defendant asked for a bill of particulars he was entitled to sufficient information to enable him to prepare a defense." *Campos*, 1968-NMSC-177, ¶ 10. However, as mentioned above, "we have never held that the State may move forward with a prosecution of supposedly distinct offenses based on no distinguishing facts or circumstances at all, simply because the victim is a child." *Dominguez*, 2008-NMCA-029, ¶ 10. This is not to say an indictment for indistinct counts must fail entirely; in *State v. Gardner*, we held that with respect to counts for which the children's statements did not have enough specific information to charge distinct incidents of abuse, the State could still proceed with a prosecution, since evidence of a course of conduct could support a single count of abuse. 2003-NMCA-107, ¶ 28, 134 N.M. 294, 76 P.3d 47.

**{18}** In *Dominguez*, the district court took up the defendant's motion for a bill of particulars to distinguish ten identical charges in the indictment (virtually identical to those in this case) and held the indictment provided sufficient notice to the defendant only because the bill of particulars filed by the State *after* the indictment described separate incidents. We held that the court properly dismissed five counts that could not be linked to a specific incident of abuse. 2008-NMCA-029, ¶¶ 10-12. We held in *Dominguez*, based on *Gardner*, 2003-NMCA-107, ¶¶ 26-28, that the charging of multiple acts in a period of time without factual differentiation between incidents or offenses permits no more than a single charge based on a course of conduct. *See Dominguez*, 2008-NMCA-029, ¶ 10. We carried this rule

6

forward in *State v. Tafoya*, 2010-NMCA-010, 147 N.M. 602, 227 P.3d 92, to hold that two indistinguishable counts of vaginal CSPM and two of anal CSPM violated the defendant's rights. In *Tafoya*, we held again that a lack of differentiation between the counts of penetration necessitated reversal of one count of each because the duplicative and undifferentiated counts established nothing more than a pattern of conduct. *Id.* ¶ 24.

**{19}** When the need for a bill of particulars is judged at the time the indictment is before the court, evidence that is disclosed later is of no consequence to the district court's consideration. In *Baldonado*, we rejected a position that the State's only obligation was to "frame the charge as it determines appropriate and provide full discovery." 1998-NMCA-040, ¶ 19. Our Supreme Court noted that the rule for a bill of particulars "would seem to make it mandatory that certain basic information, not evidence, be furnished." *Graves*, 1963-NMSC-183, ¶ 11. In this case, the district court explicitly built its denial of Defendant's motion not on the sufficiency of facts alleged in the charging document, but on the possibility of later discovery of evidence by way of interviews with the victims or other state witnesses to substitute for the paucity of facts available in the charging document itself. This is clearly insufficient under *Baldonado*, where the charging document must be evaluated as to its adequacy *prior to*, *and apart from*, speculation on evidence yet to be produced, and certainly prior to submitting any evidence to a jury. There, our ruling rejected this *post-facto* path to justification of an insufficient indictment. *See* 1998-NMCA-040, ¶ 25 ("Even granting the defendant discovery of the State's evidence may not provide adequate notice if the State, perhaps for tactical reasons, has simply failed to engage in investigational efforts to narrow the time period. Due process requires more than simple notice of the prosecution's evidence in these circumstances."). The district court erred in denying the bill of particulars based on the occurrence of subsequent witness interviews.

**{20}** Accordingly, in *Baldonado* we held that each case requires examination by the district court on a count-by-count basis as to whether an indictment is reasonably particular with respect to the time of the offense. *Id.* ¶ 26. In other words,

> what is required is an especially diligent scrutiny of the facts of the incident as they may be disclosed. The aim is to narrow the time frame of the occurrence as complained of—if not to the extent of an exact date or dates, then possibly in respect of seasons of the year, or incidents in the victim's life such as a death in the family, or a change in a family member's job routine, or the beginning of the school year or of vacation time or of extracurricular activities. When the trial court is satisfied that these sources of information have been exhausted, it will then be in a position to strike the necessary balance to determine whether "fair notice" has been given.

*Id.* ¶ 28 (internal quotation marks and citation omitted). *Baldonado* set out an extensive outline for the process by which a district court should assess allegations of insufficient specificity in the charging document. *Id.* ¶¶ 26-29.

7

**{21}** The district court was obliged, but did not attempt, to analyze the sufficiency of the indictment based on the facts underlying the charges according to the analytical framework we dictated in *Baldonado*, but moved the problem down the road by relying on the possibility that further witness interviews might produce relevant information, and on Defendant's ability to question the weight of the State's evidence at trial based on any lack of temporal specificity. This is the root of the district court's first error. In *Baldonado*, we reversed and remanded to the district court, requiring it to apply the method we adopted to determine whether the indictment was reasonably particular. *Id.* ¶¶ 29-33.

**{22}** In *Dominguez*, we affirmed the district court's culling of inadequate counts in the charging document when it used the method outlined in *Baldonado*. Under *Dominguez*'s more strict rule, it is a fair view that the charges in Defendant's indictment here are facially based on courses of conduct over a two-month period, and not "anchored to particular offenses" supporting no more than one count for each child victim. 2008-NMCA-029, ¶ 8. It is clear that the district court's failure to order the State to produce a bill of particulars to address the insufficiency of the indictment to charge specific and distinct offenses violated Defendant's rights to due process and requires reversal of five of Defendant's convictions. The sixth count as to each victim is sufficient in that it reflects Defendant's alleged course of conduct.

## B.      Sufficiency of the Evidence

**{23}** Based on our reversal, we must address Defendant's argument that sufficient evidence did not support his convictions.

**{24}** In reviewing the sufficiency of evidence on appeal, we consider the evidence presented at trial in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. The evidence supporting a conviction is sufficient when "substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). Substantial evidence is that which a reasonable mind accepts as adequate to support a conclusion. *State v. Arrendondo*, 2012-NMSC-013, ¶ 10, 278 P.3d 517. The jury instructions given in this case required the State to prove beyond a reasonable doubt that Defendant "caused [Children] to engage in sexual intercourse and/or anal intercourse, or caused the insertion to any extent, of his penis and/or fingers into the vagina and/or anus of [Children]," that Children were "under the age of thirteen," and that the acts happened in New Mexico on or between August 15, 2012 and October 13, 2012. *See* UJI 14-957 NMRA. They were differentiated only insofar as they gave the name of each child in six instructions per child. They combined two types of intercourse and sexual conduct ("sexual intercourse and/or anal intercourse") in the same count. A trial court has a duty "to withdraw a case from the jury and direct a verdict for a defendant when the State has failed to come forward with substantial evidence that the

8

defendant committed the offense charged." *State v. Maes*, 2007-NMCA-089, ¶ 22, 142 N.M. 276, 164 P.3d 975 (internal quotation marks and citation omitted).

**1.    Pattern of Conduct**

**{25}**    Children testified as to a pattern of conduct where Defendant would put his penis and fingers in each child's vagina and anus before she went to school in the mornings. The testimony revealed Defendant did this to both Child 1 and Child 2. Children testified that Defendant did this more than six times, with only one instance tied to a potentially ascertainable but unproven date (the first day of school). No other evidence tied a single incident to a certain time or place. Children were able to describe an erect male penis as well as ejaculation, and testimony was given that children of that age would not have been able to do so without having seen it before. Undifferentiated multiple acts against a victim within a period of time is evidence sufficient under *Dominguez* to support a conviction on one count per child for a pattern of conduct.

**{26}**    Child 1 provided no testimony at trial regarding any specific instances of abuse. In fact, when the State asked her about a specific incident—the putative last one before the incidents were reported—she could not remember and did not provide any details regarding what occurred, timing, or location. Child 2 also did not remember any specific details about a last incident of abuse or when it occurred. Grandmother testified to irritation on Child 1's genitals that she discovered on October 13, 2012, prior to the trip to the hospital that prompted Children to disclose the abuse. However, Children were not examined at all when at the hospital, and Children were not physically examined until two and a half weeks after Children were taken to the hospital to be examined by a pediatrician who found no physical signs of abuse on either child. Thus, no injuries existed to tie to any proximate act of abuse, either as a cause of injury, or with regard to the timing of abuse. The pediatrician testified that her finding was no indication that abuse had not taken place and that knowledge of such things is common in cases where abuse had occurred. The pediatrician also testified that Children's descriptions to her of sexual behavior would not, in her belief, be possible from girls of Children's ages without some trauma having occurred, and that one of the girls described "mixed emotions of being afraid." While this testimony corroborates the existence of abuse, it still supports nothing more than a general count for Defendant's course of conduct with regard to Child 1.

**{27}**    Child 2's responses about the day before school started were specifically limited to Defendant's actions toward her alone, and did not involve Child 1. Again, the crime attached to the date was not proven because the date school started was not proven to be within the charging period stated in the indictment.

**{28}**    Child 2 had no recollection as to a specific final incident of abuse, although the State attempted to tie the end of the period in which abuse occurred to October 13, 2012, when Grandmother observed irritation on Child 1's genital area, and Mother took Children to the emergency room. Grandmother testified that this was the second instance of such irritation,

9

having seen a similar outbreak a month previously. Detective Martinez testified that, according to interviews with Mother, she told him at the hospital that the last incident had occurred either six to eight days prior to the hospital visit, or as stated in a later interview, actually "up to fourteen days" before Children were taken to the hospital on October 13, 2012. As to this or other instances of abuse, Grandmother did not check Child 2 for similar injuries to those she reported with regard to Child 1. This testimony again supports no more than a single "course of conduct" count against Defendant. To allow counts relating to specific alleged occurrences to be decided by a jury without sufficient evidence would leave a jury unable to distinguish between any single act and the general course of conduct, giving rise to the double jeopardy problem of possible multiple convictions for the same act.

**{29}** For lack of specificity as to time, date, place, or other distinguishing facts, the testimony presented at trial supported no more than one count as to each child for the pattern of conduct that included the six alleged incidents per child, and the district court should have directed a verdict and allowed no more than those two counts—one for each victim—to go to the jury based on a pattern of conduct. *See State v. Chavez*, 2008-NMCA-126, ¶ 23, 145 N.M. 11, 193 P.3d 558, *rev'd on other grounds*, 2009-NMSC-035, 146 N.M. 434, 211 P.3d 891; *State v. Castañeda*, 2001-NMCA-052, ¶ 15, 130 N.M. 679, 30 P.3d 368 (holding that one continuous act amounting to child abuse not involving harm to multiple victims supports only one count; where harm occurs, "it is entirely appropriate to charge the perpetrator with a separate count . . . for each victim").

**{30}** We conclude that there was sufficient evidence presented at trial to support only two of the twelve counts brought against Defendant, and those based only upon a course of conduct with regard to each child.

## C. *Brady* Violations

**{31}** Defendant argues that the State engaged in misconduct by failing to disclose evidence that was material to his defense. Defendant properly preserved this issue by making a timely objection at trial. In a motion to dismiss, defense counsel pointed to two instances in which the State failed to provide material evidence that was favorable to the defense. Defendant's first claim of error is that the State failed to either acknowledge the existence of or provide copies of a report written by the pediatrician who examined Child 1 and Child 2 until just before trial started. Defendant's second claim of error is that the State did not disclose that Mother had applied for a visa that, because of her participation in this case and cooperation with law enforcement, would allow her to remain in the country legally during the pendency of this suit. We examine each assertion in turn.

### 1. Standard of Review

**{32}** In New Mexico, an alleged *Brady* violation equates to a charge of prosecutorial misconduct, which appellate courts review for an abuse of discretion. *State v. Trujillo*, 2002-NMSC-005, ¶¶ 48, 50, 131 N.M. 709, 42 P.3d 814. As such, we will affirm the district

court's decision "unless its ruling was arbitrary, capricious, or beyond reason." *State v. Turrietta*, 2013-NMSC-036, ¶ 35, 308 P.3d 964 (alteration, internal quotation marks, and citation omitted); *see Case v. Hatch*, 2008-NMSC-024, ¶ 47, 144 N.M. 20, 183 P.3d 905 (noting that "the trial court is in the best position to evaluate the significance of any alleged prosecutorial errors" (internal quotation marks and citation omitted)).

## 2.    Legal Standard

**{33}**    A defendant's due process rights are violated when the prosecution suppresses favorable evidence. *Brady*, 373 U.S. at 86-87; *Trimble v. State*, 1965-NMSC-055, ¶ 12, 75 N.M. 183, 402 P.2d 162 (applying *Brady*). A defendant seeking dismissal for a *Brady* violation must prove three elements: (1) evidence was suppressed by the prosecution; (2) the suppressed evidence was favorable to the defendant; and (3) the suppressed evidence was material to the defense. *Turrietta*, 2013-NMSC-036, ¶ 35. In order to be material under *Brady*, there must be " 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *State v. Baca*, 1993-NMCA-051, ¶ 21, 115 N.M. 536, 854 P.2d 363 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). When considering materiality, we place the suppressed evidence in the context of the entire record, rather than viewing it in isolation. "Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." *Trujillo*, 2002-NMSC-005, ¶ 50 (internal quotation marks and citation omitted).

**{34}**    The State points to our Supreme Court's case, *State v. Rondeau*, 1976-NMSC-044, ¶ 40, 89 N.M. 408, 553 P.2d 688, as support for its assertion that because the pediatrician's report and information regarding Mother's U-Visa were not suppressed throughout the entire trial, suppression of that evidence cannot constitute a *Brady* violation. In *Rondeau*, our Supreme Court interpreted *Brady* to mean that where evidence is found during trial, rather than after the trial, no *Brady* violation exists. *Rondeau*, 1976-NMSC-044, ¶ 40 ("We interpret [*Brady*] to mean that a convicted defendant would be entitled to a retrial where the prosecution suppressed, throughout the whole trial, exculpatory evidence material to the guilt or punishment of the defendant.").

**{35}**    We believe *Altgilbers*, 1989-NMCA-160, is more persuasive and applicable in this case. In *Altgilbers*, a defendant asserted that the district court's refusal to grant a mistrial resulted in a violation of his due process rights where he discovered allegedly exculpatory evidence through a witness's statements during trial. *Id.* ¶ 25. This Court, in deciding the case, drew a distinction between evidence disclosed during trial and evidence discovered only after the trial had concluded. *See id.* ¶ 26. We reasoned that, based on this distinction, "[t]he damage to [the] defendant therefore must lie in any impairment to his tactical use of the evidence because of delayed disclosure[,]" but concluded that the "imposition of a barrier to more effective use of evidence would have substantially less impact than total deprivation of use." *Id.* Rather than create a standard establishing "precisely how to weigh any particular factor in determining whether delayed disclosure violates due process[,]" this Court instead

11

reasoned that there was sufficient reason to conclude that delayed disclosure "did not deprive [the] defendant of fundamental fairness, which is the essence of due process." *Id.* ¶ 28.

**{36}** Though we acknowledge the distinction between discovery of suppressed evidence during and after trial, we see no reason to wholly depart from the considerations of materiality and prejudice set forth in *Brady*. Instead, we read *Altgilbers* to require a consideration of those factors in an assessment of the fundamental fairness of the proceedings. *See* 1989-NMCA-106, ¶ 28. In *Bagley* and *Kyles*, the United States Supreme Court explained that *Brady* is aimed at promoting the effective use of evidence. *See Bagley*, 473 U.S. at 676; *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). *Altgilbers* similarly acknowledges that the State's providing material evidence during trial stands as an "imposition of a barrier to more effective use of evidence[.]" 1989-NMCA-106, ¶ 26. Thus, it stands to reason that while post-trial discovery of evidence under *Brady* requires "a reasonable probability that . . . the result of the proceeding would have been different[,]" discovery of evidence during trial requires an evaluation of whether the late tender has impeded the effective use of evidence in such a way that impacts the fundamental fairness of the proceedings. *Altgilbers*, 1989-NMCA-106, ¶ 27.

### 3.    Pediatrician's Report

**{37}** It is hard to imagine more material evidence in a child-rape case than the results of medical examinations of the victims. "The *Brady* requirement of disclosing such material applies to all members of the prosecutorial team, including police authorities." *State v. Wisniewski*, 1985-NMSC-079, ¶ 21, 103 N.M. 430, 708 P.2d 1031 (citations omitted); *see Kyles*, 514 U.S. at 437 (stating that in the context of a *Brady* violation, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"). Although it appears unclear from the record when the State had possession of the pediatrician's report, it is undisputed that the prosecution, through its investigating detective, knew "what the medical records were going to reflect." As such, the knowledge that Child 1 and Child 2 had undergone a physical examination—a fact unknown to Defendant until just before the start of the trial—was imputed to the State. The State also had knowledge of the exculpatory aspects of the report, i.e., that neither Child 1 nor Child 2 had suffered any physical injuries to their reproductive organs.

**{38}** Though the pediatrician's report is not in the record before us, according to her testimony, she concluded that the results of the examinations were consistent with a child who had a history of being sexually abused. This evidence is clearly not favorable to Defendant. On appeal, Defendant asserts error in the district court's refusal to grant a dismissal based on the late disclosure of the pediatrician's report because defense counsel was not able to question the pediatrician prior to trial or consult its own expert about the pediatrician's report and conclusions. Specifically, Defendant asserts that had he been able to interview the pediatrician prior to calling her as a witness, he would have been able to more effectively question her regarding distinctions between different kinds of victims,

assaults, and injuries. Defendant also laments his inability to consult with an expert of his own, and he points to contrary evidence that could have been presented to refute the pediatrician's testimony.

**{39}** At no point subsequent to the report's disclosure during the proceedings did Defendant or defense counsel request a continuance to allow for an interview of the pediatrician. We also note that defense counsel did little to secure an interview with the pediatrician prior to calling her as a witness on his behalf. Defendant points to no evidence to suggest that he attempted to secure an interview with the pediatrician, despite knowing that she would not be testifying until the second day of trial. Additionally, Defendant's argument on appeal asserts prejudice in his inability to present evidence that could have been used to refute evidence that the State initially suppressed but that he himself then presented at trial. As such, we stand unpersuaded that the evidence suppressed by the State—the pediatrician's examination and report—was favorable to Defendant. Had it been truly favorable, Defendant would not have spent several pages of his brief explaining with particularity how he would have undermined the pediatrician's conclusions. We therefore conclude that, although the State did err in suppressing the pediatrician's report, Defendant has failed to demonstrate the prosecutorial misconduct necessary for reversal.[4] *See Turrietta*, 2013-NMSC-036, ¶ 35.

### 4.   U-Visa Application

**{40}** We find more merit in Defendant's assertion that the State's suppression of information regarding Mother's U-Visa application amounts to a serious discovery violation.[5] Defendant asserts that the State's suppression of the fact that Mother sought a U-Visa deprived him of an opportunity to impeach one of the State's main witnesses by providing evidence that Mother had a strong motive—staying in the United States—for fabricating charges against Defendant.

**{41}** Recognizing the importance of the U-Visa to Defendant's case, on the first day of trial the district court ordered the State to obtain a copy of the visa application and provide it to Defendant. Following that order, the district attorney's office provided Defendant a receipt for the U-Visa application dated April 10, 2013. The district court again directed the

---

[4]We note here that our conclusion as to the pediatrician's report does not condone the State's behavior in this case.

[5]According to the U.S. Citizenship and Immigration Services, a U-Visa is set aside for victims of certain crimes who have been mentally or physically hurt, and it is available to those who were, are, or are likely to be "helpful to the police or law enforcement" in the investigation or prosecution of a crime. *See* Stanford Law School Immigrants Rights Clinic, *Getting a U-Visa*: *Immigration help for victims of crime* 6 (2012) https://www.ilrc.org/sites/default/files/resources/proseuvisamanual_english.pdf.

State to obtain and provide a copy of the application to Defendant. After being ordered to produce the application, the State incorrectly represented to the district court that it had only three pages of the twenty-three page application and claimed to have given Defendant access to those three pages.

**{42}**     The second day of trial, the State produced the visa application in its entirety. The application identified the Third Judicial District Attorney's Office as the certifying agency and was dated in December 2012. Although the application referenced attached materials, including a memorandum from the investigating officer in this case and affidavits and letters intending to offer proof that Mother was "the indirect victim of a qualifying crime," none of those other materials were included with the application in the disclosure that the State made. The district court demanded that the State seek and provide those materials and admonished the State for failing to provide the U-Visa information during discovery. Defendant, after receiving copies of the letters and affidavits attached to and referenced in the application, argued that the late disclosure of these materials constituted a *Brady* violation and again requested dismissal. The district court again denied Defendant's motion to dismiss, but suggested that if defense counsel felt the case had been compromised, he could "combat that" by using the documents that had been produced that day when questioning the remaining witnesses. In reaching this decision, the district court reasoned that allowing Defendant to question Mother regarding immigration issues related to the U-Visa could be "interpreted as a sanction against the State for failure to disclose something that they clearly knew about."

**{43}**     It is clear from the record that the State suppressed the production of the U-Visa application to Defendant. Although the State made repeated representations to the district court that it had no knowledge of the U-Visa application, the knowledge of the members of the State's prosecution team is imputed on the State. *See Wisniewski*, 1985-NMSC-079, ¶ 21. The application contained letters from individuals within the district attorney's office, as well as a memorandum from the investigating detective in this case. Mother acknowledged that she received help from the local police department in obtaining and completing the U-Visa application. We agree with the district court's assessment in this regard: "It would have been a very appropriate document to share. . . . [It] has way too many items that came in support of it from the [d]istrict [a]ttorney's office and from law enforcement. Those components of [the application] certainly should have been part of the discovery."

**{44}**     Throughout the trial below, it is clear that the State was not forthcoming with information regarding the U-Visa. The State's representations to the district court regarding the U-Visa evolved throughout the trial, beginning with a denial of knowledge of its existence and ending with production of a twenty-three page application as well as letters from individuals working in the district attorney's office and a memorandum from the investigating detective. The State's actual knowledge of the application is, in this case, adequate evidence for us to conclude that the State erred in suppressing the U-Visa impeachment evidence and acknowledge that the first prong of the *Brady* test is satisfied.

14

**{45}** It is also clear that the evidence suppressed was favorable to Defendant. Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule, as both are " 'evidence favorable to an accused.' " *Bagley*, 473 U.S. at 676 (quoting *Brady*, 373 U.S. at 87); *cf. State v. Baca*, 1995-NMSC-045, ¶ 39, 120 N.M. 383, 902 P.2d 65 (considering "egregious error" of improper exclusion of evidence impeaching the State's primary witness in concluding cumulative error occurred). Had the U-Visa information been disclosed earlier, Defendant could have questioned the investigating detective regarding his involvement in Mother's visa application. Defendant could have interviewed the people who submitted the letters and affidavits that accompanied the visa application to determine Mother's position regarding her status as an illegal immigrant. Defendant could also have presented evidence regarding the U-Visa process itself. Such information includes the fact that Mother and Child 1 and Child 2 could legally live in the United States for four years and would be eligible to apply for a green card to live here permanently after three years.[6] Thus, if Mother were successful in obtaining a U-Visa, she could secure United States citizenship for not only herself, but her daughters as well.[7]

**{46}** Instead of proffering that evidence, Defendant was only allowed to question Mother about the U-Visa. When asked what a U-Visa is, Mother replied, "I don't know. It's something conditional." Mother admitted to having been deported once before in 2006. Such evidence, viewed in conjunction with the impeachment evidence regarding the U-Visa, would have been relevant to the issue of Mother's possible bias; Mother, as an illegal immigrant, submitted a visa application with the assistance of the State and the investigating officer that could allow her to reap substantial immigration benefits for Children and herself through involvement in this case against Defendant. Such evidence would undoubtedly be favorable to Defendant.

**{47}** Finally, it appears from the nature of the evidence suppressed as well as the central

---

[6]U.S. Citizenship and Immigration Services, *Victims of Criminal Activity: U Nonimmigrant Status*, Department of Homeland Security (July 28, 2016), https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status; Stanford Law School Immigrants' Rights Clinic, *Getting a U-Visa: Immigration help for victims of crime* 4 (2012), https://www.ilrc.org/sites/default/files/resources/proseuvisamanual_english.pdf.

[7]U.S. Citizenship and Immigration Services, *Victims of Criminal Activity: U Nonimmigrant Status*, Department of Homeland Security (July 28, 2016), https://www.uscis.gov/humanitarian/victims-human-trafficking-other-crimes/victims-criminal-activity-u-nonimmigrant-status/victims-criminal-activity-u-nonimmigrant-status; Stanford Law School Immigrants' Rights Clinic, *Getting a U-Visa: Immigration help for victims of crime* 5 (2012), https://www.ilrc.org/sites/default/files/resources/proseuvisamanual_english.pdf.

role of the witness whom it impeached, there is a reasonable probability that the result of the trial would have been different if the impeachment evidence regarding the U-Visa had been properly disclosed. Mother's influence over other testifying witnesses has implications for much of the evidence in this case. As evidence of bias and even a possible motivation for lying or fabricating allegations, it taints not only her own testimony, but also the testimony of Children and Grandmother. As such, evidence regarding the veracity of Mother's statements or evidence that she was biased against Defendant is material to the outcome of Defendant's trial. Defendant has demonstrated that evidence regarding Mother's U-Visa application was suppressed, was favorable to him, and was material to his defense. Although Defendant has demonstrated all three *Brady* prongs, we look also to whether the suppression of the U-Visa evidence impeded Defendant's effective use of it in such a way that the fairness of the proceedings is called into question. We conclude that while it was error for the State to withhold the U-Visa application, Defendant has not demonstrated that this error, by itself, is sufficiently egregious to call into question the fairness of the entire trial.

## D.  Cumulative Error

**{48}**  "The doctrine of cumulative error requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Woodward*, 1995-NMSC-074, ¶ 59, 121 N.M. 1, 908 P.2d 231 (internal quotation marks and citation omitted), *abrogated on other grounds as recognized by State v. Montoya*, 2014-NMSC-032, 333 P.3d 935.

**{49}**  The district court committed numerous errors in this case. As explained more fully above, the district court erred by not granting Defendant's motion for a bill of particulars. The district court erred by refusing to grant Defendant's motion for directed verdict. The district court erred in allowing six identical, factually undifferentiated counts per child, demonstrating an unawareness of the course of conduct standards enumerated in *Dominguez* and *Baldonado*. The district court made questionable decisions regarding the State's late disclosure of the examining pediatrician's report. The district court allowed the State to improperly withhold material evidence regarding Mother's U-Visa application that was favorable to Defendant. The district court allowed the suppression of the U-Visa information despite the State's repeated refusal to acknowledge that it has a duty to learn of any favorable evidence known to the others acting on the government's behalf and despite the State's misleading representations regarding the level of involvement that police and the district attorney had in assisting Mother with applying for the visa.

**{50}**  The district court permitted the trial to go forward without allowing Defendant any additional time to conduct a meaningful review of untimely disclosed evidence. Defendant was forced to call a witness without the benefit of a prior interview. Despite eventually being given information that was key to impeaching one of the State's key witnesses, Defendant had no opportunity to effectively use that information to his advantage. The jury was then presented with six identical counts per child, with no way to distinguish between each offense or act. Under these facts and circumstances, we cannot conclude that Defendant had

16

a fair trial. These numerous errors, considered together, rise to the level of prejudice so great that we must conclude Defendant was deprived of a fair trial.

## III.   CONCLUSION

**{51}**   Based on the foregoing, we reverse Defendant's convictions on ten counts of criminal sexual penetration of a minor and remand for dismissal of those counts. In addition, we remand for Defendant to receive a new trial on two counts representing a single course of conduct as to each child.

**{52}   IT IS SO ORDERED.**

 

**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

**JAMES J. WECHSLER, Judge**

**LINDA M. VANZI, Judge**